[No. D053377. Fourth Dist., Div. One. May 21, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMAL ROOSEVELT ROBERTS III et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts V and VI.

## COUNSEL

Allen R. Bloom for Defendant and Appellant Jamal Roosevelt Roberts.

Daniel G. Koryn, under appointment by the Court of Appeal, for Defendant and Appellant Milton Allen Pettis.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Pamela Ratner, Ronald Jakob and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**HUFFMAN, J.**—A jury convicted Jamal Roosevelt Roberts III and Milton Allen Pettis of conspiracy to commit murder (Pen. Code,[1] §§ 182, subd. (a)(1), 187, subd. (a)) and found the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang within the meaning of section 186.22, subdivision (b)(1).

Roberts contends his conviction must be reversed because the evidence against him was obtained as a result of an illegal wiretap under the Presley-Felando-Eaves Wiretap Act of 1988 (§ 629.50 et seq.) (Act) and in violation of his rights under the Fourth Amendment to the United States Constitution. Roberts also contends the court erred when it did not suppress evidence obtained as a result of an illegal vehicle stop, admitted prejudicial and damaging gang-related photographs and allowed inadmissible gang expert testimony about his state of mind and conduct. He raises a claim of ineffective assistance of counsel. In addition, Roberts claims the denial of his motion for separate trials constituted an abuse of discretion and resulted in a violation of his federal due process and Fourteenth Amendment rights. Notwithstanding these errors, Roberts asserts the evidence was insufficient to support his conviction for conspiracy to commit murder.

Pettis contends the court erred when it denied his motion to suppress evidence obtained by wiretaps.[2] He asserts his conviction is not supported by substantial evidence.

For reasons we shall explain, we conclude that the wiretaps were obtained legally and minimized in accordance with the relevant statutes. We do find that the court erred when it did not require the state to provide timely reports to the court under section 629.60 and to file an application to use nontargeted intercepted communications as soon as practicable as required by section 629.82, subdivision (a)(1).

As a matter of first impression, we hold that when a defendant moves to suppress evidence on the grounds the reports required under section 629.60 were inadequate or untimely, the state has the burden to show there was no error, the violation did not contravene a central purpose of the Act, or the purpose of the provision was achieved despite any error. (*People v. Jackson* (2005) 129 Cal.App.4th 129, 146–147 [28 Cal.Rptr.3d 136] (*Jackson*).) We conclude under this framework the court did not err when it denied defendants' motion to suppress wiretap evidence under section 1538.5.

---

[1] Unless otherwise indicated, further statutory references are to the Penal Code.

[2] Each appellant joins in the issues raised by the other to the extent the issues accrue to his benefit.

Because of the judicially authorized intrusion into a constitutionally protected zone of privacy, the state and the court must strictly comply with statutory requirements. During the pendency of the wiretap, the supervising judge must closely monitor the state's compliance with the authorization order to ensure the intercepted communications are properly minimized and to immediately terminate the wiretap order if warranted. Section 629.60 is central to the Act because it allows the judge supervising the wiretap to ascertain the need for continued interception of private communication. The supervising judge must also maintain meticulous records of the proceedings.

We also find the Act requires court approval to use intercepted communications related to certain enumerated offenses that were not the target of the wiretap order before those communications may be used in criminal court proceedings. Although we conclude the court erred when it did not consider the application and later, when the omission was brought to its attention, did not make the findings required by law, the errors were harmless. Otherwise we find no error and affirm the judgments.

## FACTS

The criminal proceedings against Roberts and Pettis resulted from the convergence of two chains of events—a history of retaliatory violence between the Deep Valley Crips (Crips) and the Deep Valley Bloods (Bloods), street gangs which operated in the same area of northern San Diego County, and a law enforcement investigation into narcotics trafficking by the Crips, which eventually involved wiretap surveillance of Roberts's and Pettis's cellular telephones. Crips members and associates were predominantly, but not exclusively, African-American. The Bloods were known as a Samoan gang and wore red to signify membership.

Defendants Roberts and Pettis are two of eight members of the Crips who were indicted in March 2005 on charges of conspiracy to commit murder for the benefit of, at the direction of, or in association with a criminal street gang. (§§ 182, subd. (a)(1), 186.22, subd. (b)(1), 187, subd. (a).) Fellow Crips members Curtis Brown, Calvin Landfair, Timothy Jackson, William Bright, Jr., Arthur Harvey and Terrell Jackson were also named in the indictment. Pettis's moniker was "Shakes" and Roberts's monikers were "J-Low" and "Low."[3]

Beginning in the early 1990's, the Crips' and the Bloods' competing claims to the Deep Valley area in Oceanside led to a series of retaliatory

---

[3] For convenience and clarity, we use defendants' names in place of their monikers in this opinion.

murders and shootings. The violence escalated after November 2002, when a Crips gang member randomly shot into a home known to be a meeting place for the Bloods and killed Pearl Seau, an important figure to the Bloods.

Multiple retaliatory shootings between Crips and Bloods occurred in November 2003 and March, July and September 2004. In March 2004 Bloods shot at the homes of Pettis's and Calvin Landfair's mothers while family members were present. The last shooting in this timeframe occurred on September 11, 2004, when Bloods shot at an apartment where a group of Crips was gathered and a Crips member retaliated, killing a member of the Bloods.

In early 2004, the narcotics task force (task force), a federal, state and local multiagency unit assigned to the Drug Enforcement Administration (DEA), began an investigation into alleged drug trafficking by Pettis and the Crips. In November, when the investigation stalled, the task force obtained wiretaps on the cell phones used by Pettis and Curtis Brown.[4]

The course of the narcotics investigation changed when officers intercepted the following telephone call from Pettis to Landfair on December 13, 2004 (call 4678).[5]

"[Pettis]: Hey, I want to put something together, man. I think they kinda due for it.

"[Landfair]: What's up?

"[Pettis]: You got, you got any plans, any ideas about, you know, some Sams?

"[Landfair]: What's crackin' with them?

"[Pettis]: Some credible heads, you know? You know what I mean?

"[Landfair]: Yeah.

"[Pettis]: I'm just fuckin' with credible heads, you know what I mean?

"[Landfair]: Yeah.

---

[4] We discuss the wiretap applications, supporting affidavits and orders in Discussion, IB., *post.*

[5] This intercepted call was referred to as the "credible heads call" throughout the criminal proceedings. The other intercepted calls were identified by the session number listed on the front sheet of each transcribed call.

"[Pettis]: Not just anybody that's got red shoes on. You know what I mean?

"[Landfair]: Yeah.

"[Pettis]: If you got any, I mean any info, man. I think it's prime time right now. They're laid back, they're kickin' back and they think it's over.

"[Landfair]: That's what we tryin' to find out.

"[Pettis]: Oh, you guys are.

"[Landfair]: Yup.

"[Pettis]: Okay, listen, man. I'm sayin' right now, man. Any credible heads, man, let me know. Let's put something together, man. I've been talking to [Roberts] and I've been talking to a couple of cats, man. I think it's due, they're due for a major smashing, man. We're ready for wave number two. You know what I'm sayin'?

"[Landfair]: Yeah.

"[Pettis]: So, any credible heads, [J.L.], [S.], [M.] I mean . . . you're over there. You know more than me. You know what I mean?

"[Landfair]: We trying to get two niggers. We tryin' to get one. One [S.] kidnap that nigger and do some torture to him, and then that black nigger [D.] We're trying to get him. We're trying to get them before Christmas.

"[Pettis]: Okay, listen, if you already got, if you already got a team. If you already got a squad together . . . let me know about, like if you know two different spots, let me know about one of them, so we could hit 'em both at the same time. I mean, they're due for a major let down, homie. You know what I mean. . . . Not so much, but major heads.

"[Landfair]: Yeah.

"[Pettis]: So, the nigger . . . you want to kidnap him and get some info from him?

"[Landfair]: Yup.

"[Pettis]: And after you get the info, lay him down?

"[Landfair]: Yup.

"[Pettis]: Okay. Alright, I like that. But we want info on heads, homie. . . . On straight heads . . . like that nigger called [B.] or whatever his name is.

"[Landfair]: Yeah.

"[Pettis]: That nigger, preferably, [L.R.]

"[Landfair]: Yeah, that's one, that's one . . . I'm trying to get too.

"[Pettis]: . . . [B.R.] too but [L.R.] more him cause he's kinda like active and he think he's a tough shit. . . . I think it'll affect them more than [B.R.] . . . You know what I mean? But credible heads, man. That's what I'm talkin' about credible heads. Everybody else, I'm not, I'm not doin' it. It's all good if it goes down, but I want heads. You know [what] I mean?

"[Landfair]: Yeah.

"[Pettis]: I want heads where they be like, 'Oh my God, yeah! woo woo.' You know what I mean?

"[Landfair]: For sure."

Later that day, Curtis Brown telephoned Pettis to tell him he had located one of the "credible heads" and he had called Landfair to obtain a weapon. During the next few days, Pettis spoke with Roberts and other Crips members as they tried to find leaders of the Bloods and secure guns.

On December 15, Pettis telephoned Roberts and asked if Roberts had talked with Landfair. Pettis said, "I was tryin' to blow you up, man, because [Landfair] . . . had an eye on some of those cats." Roberts replied, "K-Swiss [(a Crips member)] got the . . . one heat. [¶] Pettis: Okay. [¶] Roberts: You know what I mean? And then Crash [(a Crips member)] got the other heat . . . . [¶] Pettis: [Landfair] and the other homies had a eye ball on about four of them whoppty woops . . . . And we had no access to no thumper."

Pettis telephoned Roberts on December 16 to ask if he had obtained the "thumper" from Crash. Pettis was worried Crash would not supply the weapon. Roberts said Crash called to tell him to pick it up. On January 3, 2005, Roberts told Brown he was able to buy guns for $200 each. Brown asked Roberts to "put me in for one."

The task force obtained a wiretap on Roberts's cell phone. It went into operation on January 6, 2005.

On January 15 and 16, 2005, the task force intercepted a large number of calls to and from Pettis, Roberts, Brown and others indicating that action by the Crips against the Bloods was imminent. Roberts learned that one of the Bloods' "big homies" had been released from jail and would attend a gathering at a relative's home to celebrate his release. The mother of Roberts's child, who was Samoan, had shown him the house. Roberts and others watched the home on R. street in the Deep Valley area of Oceanside. Roberts also had information that Bloods were meeting at a park.

During a call on January 16, Pettis telephoned Arthur Harvey. Roberts was with Harvey. Pettis told Harvey, "Listen to what I'm sayin', Harv. Those [Bloods] are havin' a meeting in the valley right now.

"[Harvey]: Yeah, I know. I know. We, hey, we on it, homie. [¶] . . . [¶]

"[Pettis]: I was just making sure everyone knew because.

"[Harvey]: Oh, we on it."

Pettis asked to speak to Roberts. He asked Roberts, "Hey, how many thing-things you got?

"[Roberts]: Two. [¶] . . . [¶]

"[Pettis]: . . . just two? . . . Hey . . . I need you to do it right now."

Roberts told Pettis he was looking for Brown because he wanted to "roll down" there himself. Roberts wanted to use Brown's car because the brakes on his vehicle squealed. Less than 20 minutes later, Brown telephoned Pettis and said he and Roberts were "going to the valley."

The task force was conducting a rolling surveillance in Deep Valley, focusing on the areas mentioned in the intercepted calls as likely targets. When members of the task force observed Roberts and Brown driving in the neighborhood where the party was to be held, they instructed officers to use any pretext to pull them over. Officer Norton noticed Brown's car had dark tinted side windows. Brown was driving. Roberts was in the front passenger seat.

Norton told Brown he stopped the car because of its tinted front side windows. Norton smelled alcohol. He saw a plastic cup in the center console.

When Brown admitted the cup contained alcohol, the officer asked Brown and Roberts to step out of the car. Norton found a semiautomatic handgun under the front passenger seat. The gun was loaded and its safety was off. Officers arrested Roberts and Brown.

Roberts telephoned Pettis from jail. Roberts did not understand why there had been such a large number of police officers at the stop and why his bail had been set so high. He assured Pettis he had not been talking to the police. Pettis told Roberts he was not concerned by the arrest because Roberts had not done anything. Roberts replied, "Yeah, but the thing about it is I was about to. [¶] Pettis: You almost did? [¶] Roberts: Yes."

Pettis told a friend of Brown's he expected Roberts and Brown to be released from jail within days (call 12492). Pettis explained, "They got caught before they shot the gun . . . . [Brown] got caught with a couple of my home boys they went to go shoot at some, some Samoans, but they got caught before they busted."

Pettis was arrested on January 20, 2005.

The task force executed search warrants on the homes of the suspected coconspirators, including the residences of Roberts and Pettis. They seized a large number of photographs. Roberts appeared in many of the photographs. Pettis appeared in some of them. Generally, the photographs showed known Crips members and associates, including convicted felons, dressed in gang attire, holding weapons and displaying hand signs and tattoos.

At trial,[6] the prosecution introduced evidence of all intercepted telephone conversations between Pettis, Roberts and others in which they discussed a plan to shoot leaders of the Bloods. The court admitted the photographs and the evidence obtained as a result of the vehicle stop, including the gun found under Roberts's car seat.

Detective Mike Taele, a qualified gang expert with the special enforcement unit of the Oceanside Police Department, testified about the slang terminology used in the intercepted calls. Taele testified "credible head" is a reference to someone who has significant status within the set whose demise would impact and demoralize the set if taken out. He explained to "lay him down" means to murder someone. "Thing-thing," "thang," "heat," "heaters," "hizzy" and "zizang" are terms for a gun. A "thumper" is a personal weapon, possibly

---

[6] The relevant pretrial motions, here, defendants' motions to suppress all evidence obtained from the wiretaps and to exclude gang-related evidence, and Roberts's motions for separate trials and to suppress all evidence obtained from the vehicle stop, are set forth in detail in Discussion, *post.*

a shotgun. "We heated" means the men are carrying guns. "Slob niggas" are Blood gang members. It is a reference to the enemy. "Whoppty woops" has different meanings depending on context. The phrase may refer to Bloods or the men who will carry out the plan.

Roberts presented evidence to show he was on good terms with his child's maternal family, who are Samoan, and the family's friends, including members and associates of the Bloods. He asked the jury to infer that because of those relationships, he would not seek to kill members of the Bloods.

Pettis testified he was not a member of the Crips. On December 13, 2003, Pettis learned the identity of the person responsible for the shooting at his mother's home and he had been venting about it to Landfair. He did not want to kill anyone. The gang detective misinterpreted some of the slang he used during the conversation. "To lay someone down" did not mean to kill him. Pettis did not know that Roberts and others were planning to shoot at the Samoans until Roberts telephoned him from jail.

## DISCUSSION

## I

## *WIRETAP CHALLENGES*

### A. *Overview of State Wiretap Law*

■ " 'In general, California law prohibits wiretapping.' " (*People v. Leon* (2007) 40 Cal.4th 376, 383 [53 Cal.Rptr.3d 524, 150 P.3d 207] (*Leon*), quoting *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1195 [105 Cal.Rptr.2d 187] (*Zepeda*); see Cal. Const., art. I, § 1.) "California's wiretap law subjects the authorization of electronic surveillance to a much higher degree of scrutiny than a conventional search warrant." (*Jackson, supra,* 129 Cal.App.4th 129, 144.) The purpose of wiretap laws is twofold: " ' "(1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized." [Citation.]' "[7] (*Jackson,* at p. 147, quoting *Halpin v. Superior Court* (1972) 6 Cal.3d 885, 898 [101 Cal.Rptr. 375, 495 P.2d 1295].)

■ In interpreting a state wiretap scheme, the reviewing court may look for guidance to cases under title III of the Omnibus Crime Control and Safe

---

[7] "Wire communication" includes electronic communications. (§ 629.51; see 18 U.S.C. § 2511(1)(a).)

Streets Act of 1968, 18 United States Code sections 2510 to 2520 (federal wiretap act), "which 'provides a "comprehensive scheme for the regulation of wiretapping and electronic surveillance." ' " (*Leon, supra,* 40 Cal.4th at p. 384, quoting *People v. Otto* (1992) 2 Cal.4th 1088, 1097 [9 Cal.Rptr.2d 596, 831 P.2d 1178]; see *People v. Superior Court (Westbrook)* (1993) 15 Cal.App.4th 41, 48 [18 Cal.Rptr.2d 617].) The federal wiretap act establishes minimum standards for the admissibility of evidence procured through electronic surveillance. State law cannot be less protective of privacy than the federal wiretap act. (*Leon, supra,* at p. 384; *Otto, supra,* 2 Cal.4th at p. 1098.)

■ A designated judge may authorize a wiretap when the judge finds there is probable cause to believe that an individual is, was, or will be committing one of the crimes specified in the statute (§ 629.52, subd. (a)), particular communications about the offense will be intercepted (§ 629.52, subd. (b)) and the device is used or leased by the person targeted by the wiretap (§ 629.52, subd. (c)). The judge must also determine that normal investigative procedures have been tried and failed, or appear reasonably unlikely to succeed, or would be too dangerous if tried. (§ 629.52, subd. (d).)

The wiretap must be conducted to minimize the interception of communications not otherwise subject to interception. (§ 629.58.) A wiretap cannot be authorized longer than necessary to achieve its objective or 30 days, whichever occurs first. On new application, the court may authorize an extension of the existing wiretap. (*Ibid.*)

The wiretap authorization order requires reports in writing or otherwise to be made to the judge who issued the order. The reports must be filed with the court at intervals the judge may require, but not less than one for each six-day period. They must contain a statement about the progress that has been made toward the authorized objective, or a satisfactory explanation for the lack of progress, and the need for continued interception. If the judge finds that progress has not been made, the explanation for the lack of progress is not satisfactory, or there is no need for continued interception, the judge must order the wiretap to stop immediately. (§ 629.60.)

If, during the course of the wiretap, a law enforcement officer intercepts communications relating to certain crimes enumerated in section 629.82 (statutorily authorized communications)[8] other than those specified in the authorization order (nontargeted communications), the contents of the statutorily authorized, nontargeted communication and any evidence derived from

---

[8] Among these enumerated crimes are murder, solicitation to commit murder, attempt to commit murder and conspiracy to commit murder. (§ 629.52, subd. (a)(2) & (5).)

that communication may be used in any grand jury or criminal proceeding when a judge finds, upon subsequent application, that the contents of these communications were otherwise intercepted in accordance with the Act. The application is to be made as soon as practicable. (§§ 629.82, subd. (a), 629.78.)

██ A defendant may move to suppress some or all of the contents of any intercepted communication or evidence derived from it, "only on the basis that the contents or evidence were obtained in violation of the Fourth Amendment of the United States Constitution or of this chapter." (§ 629.72.) "The motion shall be made, determined, and be subject to review in accordance with the procedures set forth in Section 1538.5." (§ 629.72.) The truth-in-evidence clause (Cal. Const., art. I, § 13) does not apply to section 629.72.[9] (*Jackson, supra,* 129 Cal.App.4th at pp. 152–153, fns. omitted.)

## B. *Wiretap Procedures and Motions to Suppress*

In November 2004, to further the narcotics investigation, the task force, through the San Diego County District Attorney, applied for wiretaps on cell phones used by Pettis and Brown. The application, entitled "Wiretap No. 04-15" (initial wiretap order or wiretap 04-15), was supported by an affidavit from Oceanside Police Department Detective (then Officer) Richard Anderson, who was assigned to monitor Oceanside gang activity.

Anderson averred he had participated in numerous narcotics investigations during his career, including the current investigation. Based on the investigation to date, Anderson believed that Pettis managed a cocaine trafficking organization and that Pettis, Roberts, Brown and others were violating various criminal statutes with respect to the transportation and sale of cocaine.

The intercepted communications were expected to reveal the nature, extent, methods and scope of the narcotics operation; the identities, locations and roles of other participants; the location of controlled substances and records; the source of financial resources; and the transportation network. Anderson described the techniques and activities that had been used in the investigation

---

[9] "By its terms the truth-in-evidence clause does not apply to a statute 'hereafter enacted by a two-thirds vote of the membership in each house of the Legislature.' Section 629.72 was enacted in 1995, 13 years after the adoption of the truth-in-evidence clause. At the time of its enactment there were 40 members of the Senate. The bill passed the Senate by a vote of 28 to two (92 percent). There were 80 members of the Assembly. The bill passed by a vote of 62 to five (77.5 percent). Thus, suppression of evidence under section 629.72 is not prohibited by the truth-in-evidence clause of the California Constitution." (*Jackson, supra,* 129 Cal.App.4th at pp. 152–153, fns. omitted.)

to date, including the use of two confidential informants who had become unmanageable, and an undercover agent who met with only limited success.

On November 23, 2004, Judge Peter C. Deddeh issued an order in which he found there was probable cause to believe that Pettis, Brown, Roberts and others were committing and were about to commit "offenses involving the importation, possession for sale, transportation, and sale of controlled substances in violation of Health and Safety Code Sections 11351, 11352, 11378, and 11379 and a conspiracy to commit said crimes, with respect to substances containing cocaine and/or methamphetamine where the substance exceeds three pounds of solid substance by weight." The court determined there was probable cause to believe that communications concerning those offenses would be obtained through wiretap interception of cellular telephones used by Pettis and Brown. The court found that normal investigative techniques had been tried and failed, and appeared to be unlikely to succeed and/or would be too dangerous.

The order authorized interception of communications "concerning the commission of said offenses. (Penal Code Section 629.54(c).)"[10]

The order provided the wiretap would terminate when its objective was attained, or in 30 days from the date of the order, unless the court granted an extension. The court found that because of the ongoing nature of the criminal activity, the wiretap would not automatically terminate when the described communication was first obtained. The order prescribed "written reports to this court for every six (6) days period during the interception showing what progress had been made toward the achievement of the authorized objective, . . . each six (6) days report is to be completed and presented to this court at the earliest possible time from the end of each six (6) day period, or as this court further directs" (six-day reports).

On or about December 22, 2004, the task force applied for an extension of wiretap 04-15. The affidavit incorporated by reference Anderson's affidavit in wiretap 04-15, specifically his descriptions of the investigative procedures used to date and their limitations. In the new affidavit, Anderson identified Pettis as a documented member of the Crips and described the violent rivalry between the Crips and the Bloods. In addition to the drug activity detailed in his earlier affidavit, Anderson averred Pettis and Brown and other unknown persons were engaged in criminal street gang activity prohibited by section

---

[10] Among other requirements, section 629.54 states the order authorizing the interception of wire communications shall specify, "[a] particular description of the type of communication sought to be intercepted, and a statement of the illegal activities to which it relates." (§ 629.54, subd. (c).)

186.22. He described the "credible heads call" and several other intercepted calls in which Pettis and Brown discussed obtaining firearms and surveilling members of the Bloods.

The court issued an order extending wiretap 04-15 (extension). In addition to drug trafficking offenses, the court found there was probable cause to believe Pettis, Brown and others were participating in criminal street gang activities. The other provisions of the extension order were identical to those in the initial authorization order for wiretap 04-15.

On January 5, 2005, the task force applied for a wiretap on Roberts's cell phone. Anderson stated Roberts was using a cell phone to actively participate in the activities of Pettis's crack cocaine trafficking organization. Anderson detailed intercepted communications between Pettis and Roberts, and Brown and Roberts, discussing drug and weapon transactions.

Judge Deddeh authorized the wiretap on Roberts's cell phone on January 6, 2005 (wiretap 05-01). He found there was probable cause to believe Roberts and other Crips members were violating various drug statutes and participating in a criminal street gang. The other provisions of the order were identical to those in the initial order authorizing wiretap 04-15.

The Pettis/Brown wiretaps started November 23, 2004, and concluded on January 20, 2005, when Pettis and Brown were arrested. The wiretap on Roberts's cell phone began January 6 and concluded with his arrest on January 16. Agents intercepted approximately 12,000 calls to and from Pettis, 9,000 to and from Brown and 2,500 to and from Roberts.

None of the wiretap applications, affidavits, orders and reports was file-stamped by the clerk of court.[11]

On August 1, 2005, the prosecution filed an application to use the nontargeted, statutorily authorized communications (application) as evidence at trial. (§§ 629.82, subd. (a)(2), 629.78.) The application concerned 11 telephone calls, including the "credible heads call," that were intercepted before the court authorized the task force to intercept communications pertaining to criminal street gang activity. Notwithstanding its application to the court, the prosecution asserted the application was redundant because interception of communications involving violent crime was statutorily authorized, and the use of such communications at trial was therefore permitted.

Pettis and Roberts moved to suppress all wiretap evidence. (§ 1538.5.) They argued the wiretap applications did not meet the necessity requirements

---

[11] We presume the appellate record is correct.

of California's wiretap statute (§ 629.52, subd. (d)), the task force did not properly minimize nontargeted intercepted communications (§ 629.58), and the six-day reports were inadequate, untimely and not properly reviewed by the trial court (§ 629.60). The court (Judge Harry M. Elias) denied the suppression motion. At the prosecutor's request, the court did not rule on the application made pursuant to section 629.82, subdivision (a)(2).

Defendants' trial was delayed two years.

In August 2007, defendants renewed their motion to suppress all wiretap evidence. Defendants acknowledged Judge Elias had denied their motions to suppress, finding the wiretaps were properly minimized and the six-day reports were adequate. They argued they had not been able to fully litigate the motion because the prosecution did not produce information about the reporting process. Defendants also complained the court did not authorize the prosecution to use nontargeted intercepted communications at trial, which they identified as any intercepted conversation that did not involve drug offenses under the initial wiretap order. (§ 629.82, subd. (a).)

The court (Judge Joan P. Weber) ruled defendants had a full and fair opportunity to litigate their claims before Judge Elias and declined to hear the matter anew. With respect to the use of nontargeted, statutorily authorized communications at trial, the court found that communications relating to murdering drug trafficking competitors and weapon acquisition were sufficiently related to narcotics trafficking and therefore were authorized under the initial wiretap order.

### STANDARD OF REVIEW

" '[W]hile we defer to the [trial] court's express and implied factual findings if they are supported by substantial evidence, we exercise our independent judgment in determining the legality of a search [based] on the facts so found.' " (*People v. Reyes* (2009) 172 Cal.App.4th 671, 683 [91 Cal.Rptr.3d 415] (*Reyes*), citing *People v. Glaser* (1995) 11 Cal.4th 354, 362 [45 Cal.Rptr.2d 425, 902 P.2d 729].)

A. *Necessity*

Defendants claim the affidavits supporting wiretap 04-15 and its extension, and wiretap 05-01 contained generalized assertions of investigatory methods that were not supported by facts of the particular investigation, and the state did not exhaust normal investigatory methods before seeking the wiretaps. They assert the evidence seized from the wiretaps was improperly admitted because it was obtained in violation of section 629.50 and the Fourth Amendment.

■ Section 629.52, subdivision (d) specifies that a designated judge may enter an ex parte order authorizing a wiretap if, among other requirements, "[n]ormal investigative procedures have been tried and have failed or reasonably appear either to be unlikely to succeed if tried or to be too dangerous." This is commonly referred to as the necessity requirement. The necessity requirement ensures that wiretapping is not routinely used as an initial step in a criminal investigation or when traditional investigative techniques would expose the crime. (*Leon, supra,* 40 Cal.4th at p. 385; *United States v. Giordano* (1974) 416 U.S. 505, 515 [40 L.Ed.2d 341, 94 S.Ct. 1820]; *United States v. Kahn* (1974) 415 U.S. 143, 153, fn. 12 [39 L.Ed.2d 225, 94 S.Ct. 977].)

The necessity requirement is met if the affidavit "analyze[s] with particularity the limitations of each alternative investigative technique in achieving the goals of [the] investigation" and shows that ordinary investigative procedures, employed in good faith, are unlikely to be effective in the case. (*Leon, supra,* 40 Cal.4th at pp. 385, 389–390.) The affidavit need not exhaust all possible investigative techniques but must simply explain the retroactive or prospective failure of several techniques that reasonably suggest themselves. (*U.S. v. Van Horn* (11th Cir. 1986) 789 F.2d 1492, 1496, citing *U.S. v. Alonso* (11th Cir. 1984) 740 F.2d 862, 868 and *U.S. v. Hyde* (5th Cir. 1978) 574 F.2d 856, 867.) " 'Traditional investigative techniques' include surveillance, infiltration or undercover work, questioning of participants, execution of search warrants, and the use of pen registers and trap-and-trace devices. [Citations.]" (*U.S. v. Verdin-Garcia* (10th Cir. 2008) 516 F.3d 884, 890.)

" ' "[T]he government need not exhaust or explain its failure to exhaust every conceivable investigative procedure before resorting to wiretapping." ' " (*Leon, supra,* 40 Cal.4th at p. 395, quoting *U.S. v. Carrillo* (D.Colo. 2000) 123 F.Supp.2d 1223, 1245.) The overall burden on the government in meeting the necessity requirement for issuance of a wiretap warrant is not great. (*U.S. v. Verdin-Garcia, supra,* 516 F.3d at p. 890.)

A finding of necessity by the judge approving the wiretap application is entitled to substantial deference. (*Leon, supra,* 40 Cal.4th at p. 385 & fn. 3.)

The record supports the trial court's conclusion that the supervising judge's finding of necessity did not contravene the Fourth Amendment or section 629.52, subdivision (d). The task force's goal was to identify members of a suspected drug conspiracy, the organization's drug sources and means of delivery, and participants. (See *U.S. v. Zapata* (10th Cir. 2008) 546 F.3d 1179, 1186–1188.) Purchasing drugs from Pettis was not the sole purpose of the investigation.

Anderson detailed the investigative techniques used to date and the reasons why those techniques were no longer likely to be effective or safe. Investigators had analyzed pen registers and telephone tolls to corroborate the locations of Pettis's narcotics activities. Once that information was obtained, further analysis was of limited use. Two confidential informants were used with some initial success, but proved unreliable when they purchased drugs for their own use. The undercover agent successfully purchased small amounts of drugs from Pettis and other Crips, but had not been able to buy larger amounts or identify suppliers. Pettis had become suspicious of the undercover agent and no longer dealt with him directly.

The task force had used physical surveillance and would continue to use it. However, Pettis took measures to avoid surveillance. He abruptly changed transaction locations and met in places where background noise made it difficult to monitor the conversation. Physical surveillance rarely disclosed the substance of any communication that might lead to detection. Search warrants, interviews and grand jury proceedings would effectively terminate the investigation by alerting participants and foreclosing prosecution of some of most culpable participants in the narcotics trafficking organization.

The description of the relevant investigatory techniques that had been used in the eight-month narcotics trafficking investigation was thorough, explicit and relevant to the investigation at hand. The issuing judge reasonably determined that ordinary investigative procedures, employed in good faith, were unlikely to be effective in the case and authorized the wiretaps. (*Leon, supra*, 40 Cal.4th at pp. 385, 389–390.) We conclude the trial court's denial of the motion to suppress based on lack of necessity is supported by substantial evidence.

B. *Minimization*

Defendants contend the limited scope of the initial wiretap order authorized the task force to intercept conversations only about drug offenses, and the court should have suppressed all evidence relating to any alleged conspiracy to commit murder. Roberts and Pettis argue the authorization to intercept communications about drug-related offenses expired once the task force gathered sufficient evidence to charge them with drug offenses, and the breakdown in compliance with reporting requirements under section 629.60 prevented the court from exercising its oversight function to minimize intrusions into defendants' privacy. Defendants assert that if the court had reviewed complete and timely reports, it would have terminated the wiretap.

We have not located any California case addressing the minimization requirement under section 629.58; therefore, we look for guidance to cases under 18 United States Code section 2518(5). (Cf. *Leon, supra,* 40 Cal.4th at p. 384.)

 Under federal wiretap law, a wiretap authorization order must require the applicant to minimize communications not subject to interception and terminate the wiretap when the authorized objective is attained or when the authorization expires.[12] (§ 629.58.) The government is required to adopt reasonable measures to reduce the interception of conversations unrelated to the criminal activity under investigation to a practical minimum while permitting the government to pursue legitimate investigation. The standard for minimization is reasonableness. Reasonableness is determined from the facts of each case. (*U.S. v. Abascal* (9th Cir. 1977) 564 F.2d 821, 827; see also *Scott v. United States* (1978) 436 U.S. 128, 137 [56 L.Ed.2d 168, 98 S.Ct. 1717] (*Scott*); *U.S. v. Torres* (9th Cir. 1990) 908 F.2d 1417, 1423; *Reyes, supra,* 172 Cal.App.4th 671, 685.)

To determine whether the authorities acted reasonably to minimize the interception of nontargeted communications, the court generally reviews a variety of factors relevant to the facts of the case. These factors may include whether a large number of the calls were very short, one time only, or in guarded or coded language; the breadth of the investigation underlying the need for the wiretap; whether the nonminimized calls occurred early in the surveillance; and the extent to which the authorizing judge supervised the ongoing wiretap. (*Scott, supra,* 436 U.S. at pp. 140–141.) Other factors may include uncertainty as to scope of the alleged conspiracy, whether the conversations are between coconspirators, and whether the telephones used were public or private telephones. (*Ibid.*; *U.S. v. Yarbrough* (10th Cir. 2008) 527 F.3d 1092, 1097–1098.)

1. *The objective of the wiretap was not achieved before December 23, 2004; therefore, the initial wiretap order did not expire.*

The court cannot issue an order authorizing the wiretap for any period longer than necessary to "achieve the objective of the authorization."

---

[12] Section 629.58 provides in relevant part: "No order entered under this chapter shall authorize the interception of any . . . electronic communication for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than 30 days. . . . Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted so as to minimize the interception of communications not otherwise subject to interception under this chapter, and shall terminate upon attainment of the authorized objective, or in any event at the time expiration of the term designated in the order or any extensions."

(§ 629.58.) Defendants argue the wiretap expired as soon as the task force had sufficient evidence to convict them of drug offenses. The argument is without merit.

In its application for wiretap 04-15, the task force stated the purpose of its investigation was to identify the nature, extent, methods and scope of the narcotics operation; identities, locations and roles of other participants; the location of controlled substances and records; the source of financial re-sources; and the transportation network. (See *U.S. v. Zapata, supra*, 546 F.3d at pp. 1186–1188.) The initial order specifically provided the wiretap would not automatically terminate when the described communication was first obtained because of the ongoing nature of narcotics trafficking.

The court found there was probable cause to believe Pettis, Brown, Riley, Roberts and "others as yet unknown" were participating in a conspiracy to commit offenses involving possession for sale, transportation and sale of narcotics, including transporting drugs into the state. (Health & Saf. Code, §§ 11351, 11352, 11378, 11379.) The initial wiretap order shows the scope of the authorized investigation was not limited to individual drug sales. The supporting affidavit detailed drug transactions between Pettis and the confidential informants, and Pettis and the undercover agents. The task force had identified Pettis and his low-level sales force, but it was engaged in ongoing efforts to identify the suppliers, financial supply and transportation routes of the narcotics trafficking scheme.

The factors relevant here—the breadth of the narcotics trafficking investigation, uncertainty as to scope of the alleged conspiracy and the conversations between the coconspirators—support the trial court's conclusion that the purpose of the investigation was not yet attained and the authorization for the wiretap had not expired. (*Scott, supra*, 436 U.S. at pp. 140–141; *U.S. v. Yarbrough, supra*, 527 F.3d 1092 at pp. 1097–1098.) Substantial evidence supports the conclusion the purpose of the wiretap had not expired before the task force intercepted communications relating to the conspiracy to commit murder.

2. *Law enforcement is not required to minimize interceptions of*
 *nontargeted communications relating to criminal activity.*

Defendants contend the scope of the initial wiretap order authorized the task force to intercept conversations relating only to drug offenses. Defendants argue the task force was required to minimize any intercepted communication relating to an offense not specifically authorized in the wiretap orders, and the court should have suppressed all evidence relating to other crimes, specifically, conspiracy to commit murder. They argue the court did not

specifically include murder as a targeted offense in any of its authorization orders and the court should have suppressed all wiretap evidence relating to murder. We disagree.

Because defendants' contention involves an issue of statutory interpretation, our review is de novo. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956].)

■ Section 629.54, subdivision (c) requires the issuing court to specify a "particular description of the type of communication sought to be intercepted [(targeted communication)], and a statement of the illegal activities to which it relates" in the wiretap authorization order. Although the court merely recited this language in its order authorizing wiretap 04-15 instead of following its directives, the order states the court's finding there is probable cause to believe Pettis, Roberts and others were involved in "offenses involving the importation, possession for sale, transportation, and sale of controlled substances in violation of Health and Safety Code Sections 11351, 11352, 11378, and 11379 and a conspiracy to commit said crimes, with respect to substances containing cocaine and/or methamphetamine where the substance exceeds three pounds of solid substance by weight."

We infer this language was reasonably interpreted by the task force, and later by the parties, as the type of communication sought to be intercepted, and the illegal activity to which it relates. (§ 629.54, subd. (c).)

In construing the extent of the state's authority to intercept nontargeted communications, we look to the words of the statutes to determine legislative intent and to fulfill the purpose of the law. (*Gooch v. Hendrix* (1993) 5 Cal.4th 266, 282 [19 Cal.Rptr.2d 712, 851 P.2d 1321]; *In re Heraclio A.* (1996) 42 Cal.App.4th 569, 574 [49 Cal.Rptr.2d 713].) The language is construed in the context of the statute as a whole and the overall statutory scheme, and courts give significance to every word, phrase, sentence and part of an act in pursuing the legislative purpose. (*People v. Canty* (2004) 32 Cal.4th 1266, 1276 [14 Cal.Rptr.3d 1, 90 P.3d 1168].)

Section 629.58 of the Act requires the state to minimize "communications not otherwise subject to interception under this chapter." To fully understand the scope of authorization to intercept nontargeted communications under the Act, and the state's obligation to minimize nonauthorized communications, section 629.58 must be read in conjunction with section 629.82, subdivision (a). Section 629.82, subdivision (a), specifies: "If a peace officer or federal law enforcement officer, while engaged in intercepting . . . communications in the manner authorized by this chapter, intercepts . . . communications relating to crimes other than those specified in the order of authorization, but which

are enumerated in subdivision (a) of Section 629.52, or any violent felony as defined in subdivision (c) of Section 667.5, (1) the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in Sections 629.74 and 629.76 and (2) the contents and any evidence derived therefrom may be used under Section 629.78 when authorized by a judge if the judge finds, upon subsequent application, that the contents were otherwise intercepted in accordance with the provisions of this chapter. The application shall be made as soon as practicable."

■ Simply stated, targeted interceptions are those communications specified in the wiretap authorization order under section 629.54, subdivision (c). The state is not required to obtain judicial approval before it may use targeted interceptions in any criminal court or grand jury proceeding. However, the state must obtain judicial approval before it may use nontargeted, statutorily authorized interceptions of certain enumerated crimes in criminal court or grand jury proceedings. (§§ 629.82, subd. (a), 629.78.)

Statutorily authorized interceptions are lawfully intercepted communications relating to certain enumerated crimes other than those specified in the wiretap authorization order. (§ 629.82, subd. (a).) These enumerated crimes are defined as: "(1) Importation, possession for sale, transportation, manufacture, or sale of controlled substances . . . . [¶] (2) Murder, solicitation to commit murder, the commission of a felony involving a destructive device . . . . [¶] (3) Any felony violation of Section 186.22 [(criminal street gang activity)]. [¶] (4) Any felony violation . . . relating to weapons of mass destruction, . . . relating to threats to use weapons of mass destruction, or . . . relating to restricted biological agents. [¶] (5) An attempt or conspiracy to commit any of the above-mentioned crimes." (§ 629.52, subd. (a).)

■ As relevant here, a "pattern of criminal gang activity" under section 186.22, subdivision (e) involves "the commission of, attempted commission of, conspiracy to commit, or solicitation of, . . . two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." At the time of the events that led to these proceedings, a short list of these offenses includes assault with a deadly weapon, unlawful homicide or manslaughter, kidnapping, mayhem, torture, possession of a pistol, revolver, or other firearm capable of being concealed, and threats to commit crimes resulting in death or great bodily injury. (§ 186.22, subd. (e), eff. Jan. 1, 2002.)[13]

---

[13] After the events that led to these proceedings, the Legislature expanded section 186.22, subdivision (e) to include shooting at an inhabited dwelling or occupied motor vehicle; discharging or permitting the discharge of a firearm from a motor vehicle; the sale, delivery, or

■ Section 629.82 also encompasses any violent felony under section 667.5, subdivision (c), which enumerates many of the offenses listed in section 186.22 as well as certain sexual offenses and any felony punishable by death or in the state prison for life.

The nontargeted offenses at issue here are those communications relating to conspiracy to commit murder, including acquisition of weapons, that were intercepted before the court extended the initial wiretap order on December 23, 2004, and authorized the task force to intercept any communications relating to criminal street gang activity.

We reject defendants' arguments the task force was required to minimize communications relating to street gang activity until December 23, 2004, and all communications relating specifically to murder throughout the wiretap authorization period. Contrary to defendants' argument, as one might reasonably expect, the state is not required to minimize interception of a communication involving a planned murder, or assault with a deadly weapon, or any other crime enumerated under section 629.82. The task force was not required to turn a deaf ear to defendants' discussions relating to murder, obtaining weapons, locating their targets or recruiting other Crips members to participate in the planned retaliatory attacks against the Bloods.

■ We conclude that the court did not err when it denied defendants' motion to suppress wiretap evidence at trial on the ground the task force did not have the authority to intercept communications relating to serious offenses other than the targeted drug offenses. The offenses enumerated in section 629.82 do not require minimization if the state is intercepting communications under a lawful, existing wiretap order.

3. *The supervising judge must monitor the wiretap by promptly reviewing complete and timely reports.*

Defendants contend the court erred when it did not suppress wiretap evidence because the state did not comply with reporting requirements under section 629.60. They assert the reports lacked a progress statement or any explanation of deficiency, were generally late, one report was not signed by the court and four reports were signed by a judge who did not sign the wiretap order. Defendants claim the court erroneously stated defendants had the burden to show the reporting procedures were deficient. They argue the court erred when it ruled that defendants were required to show that any error violated the Fourth Amendment, and not a state wiretap statute, to prevail on their motion to suppress.

---

transfer of a firearm; prohibited possession of a firearm; carrying a concealed firearm; and carrying a loaded firearm. (See, e.g., Stats. 2009, ch. 171, § 1; Stats. 2006, ch. 596, § 1.)

To resolve defendants' arguments, we must examine the statute as a matter of first impression under the Act. The interpretation of a statute presents a question of law subject to de novo review. (*CBS Broadcasting Inc. v. Superior Court* (2001) 91 Cal.App.4th 892, 906 [110 Cal.Rptr.2d 889].)

Section 629.60 states: "Whenever an order authorizing an interception is entered, the order shall require reports in writing or otherwise to be made to the judge who issued the order showing the number of communications intercepted pursuant to the original order, and a statement setting forth what progress has been made toward achievement of the authorized objective, or a satisfactory explanation for its lack, and the need for continued interception. If the judge finds that progress has not been made, that the explanation for its lack is not satisfactory, or that no need exists for continued interception, he or she shall order that the interception immediately terminate. The reports shall be filed with the court at the intervals that the judge may require, but not less than one for each period of six days, and shall be made by any reasonable and reliable means, as determined by the judge."

 Unlike other state and federal wiretap provisions, section 629.60 is not commensurate with its less restrictive federal counterpart (18 U.S.C. § 2518(6)).[14] We continue to consider federal cases where appropriate. Our analysis begins with an examination of section 629.60. The statutory language is generally the most reliable indicator of legislative intent. (*Fitch v. Select Products Co.* (2005) 36 Cal.4th 812, 818 [31 Cal.Rptr.3d 591, 115 P.3d 1233] (*Fitch*).)

"The objective of statutory construction is to determine the intent of the enacting body so that the law may receive the interpretation that best effectuates that intent." (*Fitch, supra*, 36 Cal.4th at p. 818.) " 'The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context.' [Citation.] If the plain, commonsense meaning of a statute's words is unambiguous, the plain meaning controls." (*Ibid.*) "We may not, under the guise of construction, rewrite the law or give the words an effect different from the plain and direct import of the terms used." (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1995) 11 Cal.4th 342, 349 [45 Cal.Rptr.2d 279, 902 P.2d 297] (*Cal Fed.*).)

 As we have explained, California law generally prohibits wiretaps. When authorized the Act protects the privacy of wire and oral communications and delineates the circumstances under which the state may intrude into

---

[14] "Whenever an order authorizing interception is entered pursuant to this chapter, the order may require reports to be made to the judge who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception. Such reports shall be made at such intervals as the judge may require." (18 U.S.C. § 2518(6).)

private communications. (*Leon, supra*, 40 Cal.4th at p. 383; *Zepeda, supra*, 87 Cal.App.4th at p. 1195; *Jackson, supra*, 129 Cal.App.4th at p. 144; *Halpin v. Superior Court, supra*, 6 Cal.3d at p. 898.)

The statute must be construed in consideration of the state policy and its words interpreted according to their plain meaning. (*Cal Fed., supra*, 11 Cal.4th at p. 349.) Section 629.60 states that each report must be filed with the supervising judge at intervals not to exceed six days. "Interval" is "a space of time between events." (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 655.) The event specified here is "filed with the court." (§ 629.60.) We conclude that each report must reach the court no later than every six days unless the court directs the state to file the report at a more frequent interval. We believe the Act requires attentive and considered oversight by the judge that authorized the wiretap order (supervising judge) from the initial authorization order to the termination of the wiretap. Timely and ongoing reports are an integral part of this framework. There is no other provision in the Act that allows the supervising judge to monitor the continued necessity of the wiretap. (See § 629.50 et seq.)

We are not persuaded by the state's argument that because the reporting provision of the federal wiretap act is less stringent than section 629.60, and the Legislature explicitly intended to make California wiretap law " ' "conform to the federal law" ' " (*Jackson, supra*, 129 Cal.App.4th at pp. 151–152), section 629.60 cannot be considered a central provision in the Act. We presume the Legislature was aware of the less stringent federal reporting provision when it amended the Act to " 'to expand California wiretap law to conform to the federal law.' " (*Leon, supra*, 40 Cal.4th at p. 383, quoting Sen. Com. on Crim. Proc., Rep. on Sen. Bill No. 1016 (1995–1996 Reg. Sess.) as amended Apr. 3, 1995, p. i; see *Jackson, supra*, 129 Cal.App.4th at pp. 151–152; cf. *People v. Strohl* (1976) 57 Cal.App.3d 347, 359–360 [129 Cal.Rptr. 224].) The Legislature's subsequent amendment of section 629.60 to mandate that reports are "filed with the court" not less than one for each period of "six days" indicates that it intended the statute not conform to federal law in this regard. (Stats. 2002, ch. 605, § 8; Historical and Statutory Notes, 49 West's Ann. Pen. Code (2010 supp.) foll. § 629.60, p. 75 ["Stats.2002, c. 605 (A.B.74), inserted 'the number of communications intercepted pursuant to the original order, and a statement setting forth'; substituted 'filed with the court' for 'made'; and substituted 'six days' for '72 hours'."].)

Our belief the statute means what it says requires the state to prepare material for each report commensurate with its ability to timely file the report with the supervising judge within the specified time. At the same time, section 629.60 does not require the report to be in any particular form. The phrases

"the order shall require reports in writing or otherwise" and "[t]he reports . . . shall be made by any reasonable and reliable means, as determined by the judge" suggest written reports are preferred but not essential. (§ 629.60.) In any event, it will be necessary for the court and parties to maintain meticulous records of the proceedings, particularly if the reports are other than written.

Here, the task force, through the San Diego County District Attorney, submitted 10 six-day reports for wiretap 04-15 and extension to the court and two reports for wiretap 05-01. The reports provide a brief summary of the wiretap orders. They state the period of time of the report and summarize, by the target telephone number, the number of outgoing, incoming and incomplete calls. The reports detail the number of pertinent, privileged and minimized calls, and pen register activity during periods when the task force did not monitor the calls. Each report refers to an attached summary of selected intercepted calls for that time period and states the summary "serves as an update on the investigation regarding the progress that has been made, or an explanation for its lack, and the need for continued interception."

Each summary contains a list of selected calls in chronological order by target telephone and provides a brief description of the contents of the conversation, the participants, the caller and the person called, and the session (call) number. With few exceptions, the summaries focus on communications involving drug transactions. For example, on December 17, 2004, Roberts telephoned Pettis. The description in the report summary states: "[Roberts] details his 2005 cocaine acquisition, shipment, costs and expected profit margins to [Pettis], which also involved mentioning a cousin and an out of town trip to set it all up."

The length of time between the end of each six-day review period and the date the reports were signed by Deputy District Attorney Damon Mosler varied from one to 17 days. Judge Deddeh signed reports 1 through 7 from two to eight days after the date of Mosler's signature. Report 8 was not signed by a judge. Judge Michael D. Wellington signed reports 9 and 10 for wiretap 04-15 on February 3, 2005. Mosler signed those reports on February 1 and 3, respectively.

On February 3, 2005, Judge Wellington signed the two six-day reports that were prepared for wiretap 05-01. Mosler had signed the reports on February 1. They covered the reporting periods January 6 through January 11, 2005, and January 12 through 17, with lag times of 23 and 17 days, respectively.

At the suppression hearing, Detective Anderson testified the intercepted calls were monitored as they came in. If he or his partners decided there was

a pertinent call to report, they would print a synopsis of the call. At the end of the night shift, after 15 or 16 hours of monitoring telephone communications, each call was printed and placed in a binder. The following day, Anderson or the supervising agent would review the calls and set aside the calls in which narcotics, gangs, weapons and other offenses were discussed. They then would determine which calls would be included in the six-day report summary. The contents of the calls were condensed and typed. When the summary was prepared, Anderson e-mailed it to Mosler. Mosler then prepared the six-day report and attached Anderson's summary. Because of the workload and long hours, Anderson often did not complete the six-day report until the seventh or eighth day. Anderson did not know how long it took Mosler to prepare the report once he received the summary of the selected calls.

Mosler did not testify.

Judge Elias found that the six-day reports were not file-stamped and the exact date a report was filed with the court was not evident from the document itself. Judge Elias could infer the reports were filed about the date of the deputy district attorney's signature up to and including the date of the judge's signature. The exact date could not be ascertained.

Judge Elias found that defendants did not meet their burden to show the reports were not provided to the court at the earliest possible time or as directed by the wiretap orders.[15] At defense counsel's insistence the court applied the framework expounded in *Jackson, supra*, 129 Cal.App.4th at page 149, to determine whether a trial court should suppress wiretap evidence under section 1538.5.

The court stated it was not convinced defendants established a violation of section 629.60. Further, even if there were a violation, it did not contravene the Fourth Amendment. The court reasoned in view of the supervising judge's discretion under the statute, the reporting provision did not play a central role in the statutory scheme. If the provision played a central role, the judges' signatures on the reports indicated the supervising court found no reason to terminate the wiretaps. The court denied defendants' motion to suppress.

While we agree with the court's decision to deny defendants' motion to suppress, we do not completely endorse the court's legal analysis and application of section 629.60. We first address several procedural issues raised by the parties.

---

[15] Section 629.72, which governs motions to suppress wiretap evidence, requires the trial court to determine whether state action violated the Fourth Amendment or a state wiretap statute, not necessarily the court's order directing or permitting such action.

 Both parties urge this court to adopt the analysis set out by our colleagues in the Second District to determine whether to suppress wiretap evidence under sections 629.72 and 1538.5. (*Jackson, supra,* 129 Cal.App.4th at p. 149.) Under this framework, the trial court asked the following questions:

(1) Has the defendant established a violation of the Fourth Amendment or a provision of the Act? If not, the motion is denied.

(2) Does the violated provision play a central role in the Act? "If the provision was not intended to 'play a central role,' failing to comply with it will not render interceptions under the wiretap order unlawful and the motion is denied." (*Jackson, supra,* 129 Cal.App.4th at p. 149.)

(3) Was the purpose of the provision achieved despite the error? If the purpose was achieved, the motion is denied. If the purpose was not achieved, the motion is granted. (*Jackson, supra,* 129 Cal.App.4th at p. 149.)

We believe the *Jackson* framework is appropriate to apply to determine whether violations of provisions of section 629.60 merit the suppression of evidence under section 1538.5. Under this framework, the defendant has the burden to show the evidence was obtained in violation of the Fourth Amendment or a provision of the Act, and that provision was intended to play a central role in the authorization and execution of wiretaps. The burden then shifts to the state to show the statutory purpose of the violated provision was achieved in spite of the error. (*Jackson, supra,* 129 Cal.App.4th at p. 160.)

We are not persuaded by defendants' contention the court applied an incorrect standard when it remarked that any violation of section 629.60 must contravene the Fourth Amendment before the court could suppress evidence. We agree that section 629.72 clearly states otherwise. However, the record shows the court made a step-by-step analysis of alleged violations under the *Jackson* framework, which encompasses both Fourth Amendment and state statutory violations. In addressing the section 1538.5 motion, the court did not improperly omit consideration of alleged violations of provisions of the Act.

However, the evidence does not support the court's finding the state complied with section 629.60. The record shows several of the six-day reports did not reach the supervising judge for several weeks after the end of the reporting period, one report was not signed by the court and four reports were signed by a judge who did not sign the wiretap authorization order. This was sufficient to establish one or more violations of section 629.60.

Detective Anderson described the procedures he and others used to compile the summaries and the reasons the summaries might have been delayed

several days. The record supports the court's finding the procedures of Detective Anderson and his partners were reasonable, and in accord with the trial court's order. However, as we explained, *ante*, at pages 1179 to 1181, the trial court misinterpreted section 629.60.

We infer from the district attorney's prompt review of reports 1, 2, 3 and 8 of wiretap 04-15, which the district attorney signed two, one, four and three days respectively after the end of the review period, the district attorney's office had the capability to sign and file the reports in a timely manner. (§ 629.60.) However, the district attorney did not sign any other report sooner than seven days after the end of the review period, and two were not signed for 17 days.

As the trial court noted, the reports were not file-stamped by the clerk of court. We cannot determine from the appellate record when the reports were received by the court. Because of Judge Wellington's prompt review of the last two reports of wiretap 04-15, and the 05-01 reports, three of which were signed by the judge on the same date as the district attorney, we infer the reports were submitted to the court on or about the date they were signed by the district attorney. Generally, Judge Deddeh's review was not as prompt. The record shows on two occasions his review was significantly delayed for eight days and one report was not signed. Even if we were to accept the court's finding the reports may not have been filed until the date of the judge's signature, the supervising judge has a responsibility to monitor the wiretap and ensure prompt delivery of the reports in compliance with section 629.60. We do not condone the lack of timely judicial oversight evinced by this record.

Defendants contend the reference to an attached summary of pertinent communications is inconsistent with the required "statement setting forth what progress has been made toward achievement of the authorized objective." (§ 629.60.) In view of the statute's flexibility in the form of the report, and the authorization order's lack of other direction, we are not persuaded by this contention. Although the better practice is to explicitly and succinctly report the progress made toward the goals of the investigation in the body of the report, here, the supervising judge could reasonably garner that information from the summaries.

We conclude defendants established error under the first prong of the *Jackson* framework. Defendants do not argue these errors contravened the Fourth Amendment. Under *Jackson, supra*, 129 Cal.App.4th 129, the court next determines whether the violated state provisions play a central role in the wiretap statutory scheme.

Not every provision of section 629.60 plays a central role in limiting unnecessary interception of wire and oral communications. A central role is one that affects the legality of the authorization or the execution of the wiretaps. (See *United States v. Giordano, supra*, 416 U.S. 505, 527 [exclusion of wiretap evidence required when there is a failure to satisfy statutory requirements that directly and substantively limit the use of wiretaps to those situations clearly calling for employment of this extraordinary investigative device].)

Contrary to defendants' assertions, we do not believe the requirement the report be signed only by the judge that issued the authorization order plays a central role in the statutory scheme. As a practical matter, a supervising judge may be unavailable. Rather than forgo prompt judicial oversight of the wiretap, a fully informed judge may review the reports. A substitute supervising judge is capable of reviewing the wiretap order, determining the goal of the investigation and the targeted offense (if not set forth in the report) and immediately terminating the wiretap if indicated. (See *U.S. v. Love* (S.D.N.Y. 1994) 859 F.Supp. 725, 731–732.)

However, the lack of timeliness and prompt judicial review contravenes a central purpose of the Act and, as such, the timely filing requirement under section 629.60 plays a central role. California law generally prohibits wiretaps and delineates the circumstances under which the state may intrude into private communications. (*Leon, supra*, 40 Cal.4th at p. 383; *Halpin v. Superior Court, supra*, 6 Cal.3d at p. 898; *Zepeda, supra*, 87 Cal.App.4th at p. 1195; *Jackson, supra*, 129 Cal.App.4th at p. 144.) Section 629.60 prescribes timely and ongoing judicial oversight of a wiretap order and mandates immediate termination of the wiretap when the judge finds that progress has not been made, the explanation for the lack of progress is not satisfactory or no need exists for continued interception.

The third prong of the *Jackson* framework requires the state to show that the purpose of the provision was achieved despite the error. (*Jackson, supra*, 129 Cal.App.4th at p. 149.) Here, the evidence shows the task force continued to intercept communications relating to narcotics trafficking. The supervising court could draw the reasonable inference the task force was making progress toward the achievement of the authorized objective. (§ 629.60.) With the exception of the unsigned report, the reports were approved by a supervising or substitute supervising judge. (Cf. *In re DeMonte* (7th Cir. 1982) 674 F.2d 1169, 1174.) Had the reports been timely issued, the supervising judge would not have immediately terminated the wiretap. We also note the task force informed the supervising judge about the communications relating to conspiracy to commit murder in its application for an extension of wiretap 04-15. In approving the wiretap extension and wiretap 05-01, the supervising

judge was informed of developments and, as we discussed earlier in this opinion, made the appropriate findings of necessity. We conclude that the purpose of the provision was achieved despite the errors.

To summarize, we adopt the *Jackson* framework for evaluating whether a motion to suppress wiretap evidence should be granted. (*Jackson, supra,* 129 Cal.App.4th at p. 149.) We hold that this framework is applicable to evaluate alleged violations of section 629.60. Once the defendant has established a violation of any provision of section 629.60 and the provision plays a central role in the Act, the burden shifts to the state to show the purpose of the provision was achieved despite the error. (*Jackson, supra,* at p. 149.)

 The purpose of the reporting statute is to allow the supervising judge to promptly and effectively exercise his or her oversight responsibilities after the judge has authorized a wiretap, and to "immediately terminate" the interception when progress has not been made, the explanation for the lack of progress is not satisfactory or no need exists for continued interception. (§ 629.60.) The judge who authorized the wiretap, or a fully informed substitute judge, is responsible for thoroughly reviewing the reports, communicating with the state if the report lacks the specificity required under section 629.60 or are not filed as soon as practicable, and maintaining a meticulous record of all wiretap proceedings.

4. *The application to use statutorily authorized, nontargeted communications in the criminal court and grand jury proceedings was not made or reviewed as soon as practicable; however, the error does not require reversal.*

Defendants assert the court erred when it did not suppress 11 intercepted calls (11 calls or material), including the "credible heads call," that were made before the court approved the extension order on December 22, 2004, authorizing the task force to intercept communications relating to criminal street gang activity. They argue the court erred when it allowed the state to use this material in the criminal court and grand jury proceedings without having made the judicial findings required under sections 629.82, subdivision (a), and 629.78 within the statutory timeframe.

To determine whether the evidence was improperly seized or improperly admitted at trial, resulting in a violation of the Fourth Amendment, we exercise our independent judgment to assess the legality of the search and examine whether the evidence would have been excluded had the court ruled on the application. (*Reyes, supra,* 172 Cal.App.4th at p. 683.) We keep in mind the purpose of section 629.82 is to prevent the state from fishing for information in constitutionally protected waters. (Cf. *U.S. v. Van Horn*

(11th Cir. 1986) 789 F.2d 1492, 1504 [the purpose of the comparable federal statute, 18 U.S.C. § 2517, is to prevent subterfuge].)

On August 1, 2005, the district attorney filed an application with the court to use the 11 calls at trial. During the suppression hearing, at the request of the district attorney, who had interpreted section 629.78 as authority to use statutorily authorized, nontargeted communications at trial without judicial approval, the court did not rule on the application. This was error.

On August 1, 2007, in a comprehensive suppression motion, defendants challenged the lack of judicial authorization to use the material. The trial court reasoned that although the nontargeted calls were not directly related to narcotics trafficking, the 11 calls could be used at trial because they concerned crimes enumerated in section 629.52, subdivision (a), and thus were properly intercepted. The court erred as a matter of law. This ruling was incorrect.

Section 629.52 lists offenses for which the court may authorize a wiretap order. It does not concern offenses that were not targeted in the initial order. The state acknowledges the statutory provisions that govern the use of the contents and evidence derived from interceptions of nontargeted communications are found in sections 629.82 and 629.78.

Section 629.82 states in relevant part: "(a) If a peace officer or federal law enforcement officer, while engaged in intercepting . . . electronic cellular telephone communications in the manner authorized by this chapter, intercepts . . . electronic cellular telephone communications relating to crimes other than those specified in the order of authorization, but which are enumerated in subdivision (a) of Section 629.52, or any violent felony as defined in subdivision (c) of Section 667.5, . . . (2) the contents and any evidence derived therefrom may be used under Section 629.78 when authorized by a judge if the judge finds, upon subsequent application, that the contents were otherwise intercepted in accordance with the provisions of this chapter. The application shall be made as soon as practicable."

Section 629.78 states: "Any person who has received, by any means authorized by this chapter, any information concerning . . . electronic cellular telephone communication, or evidence derived therefrom, intercepted in accordance with the provisions of this chapter, may, pursuant to Section 629.82, disclose the contents of that communication or derivative evidence while giving testimony under oath or affirmation in any criminal court proceeding or in any grand jury proceeding."

As we have discussed, *ante*, the state is not required to minimize communications relating to certain enumerated crimes. (§ 629.82.) However, the Act

limits the use of such intercepted communications. (§§ 629.74, 629.76, 629.78, 629.82.) As relevant here, before the contents of any statutorily authorized, nontargeted communications, and any evidence derived from those communications, may be used in a criminal court proceeding, the state must apply to a judge for authorization. (§§ 629.78, 629.82, subd. (a).) This application must be made "as soon as practicable." (§ 629.82, subd. (a)(2); see § 629.78.) The judge cannot authorize the use of the nontargeted intercepted communications at trial unless he or she finds that the nontargeted communications were otherwise intercepted in accordance with the Act. (§§ 629.82, subd. (a)(2), 629.78; see § 629.54.)

Defendants were arrested in mid-January 2005. A grand jury proceeding began on March 23 and concluded on March 30, 2005. On March 30, the grand jury issued indictments. The state filed an application under section 629.82, subdivision (a)(2) on August 1. Motion hearings involving the 11 calls began on September 21, 2005. In view of the state's careful preparation of the wiretap evidence to present its case to the grand jury, the court could have inferred the application could have been filed more promptly.[16]

 A trial court has substantial discretion to deny a late application under section 629.82, subdivision (a)(1). It is not, however, required to do so. Had the trial court considered the application under section 629.82, subdivision (a)(2), we do not believe the court would have denied the prosecution the use of the nontargeted, statutorily authorized communications at trial on the ground the application was untimely.

Although the trial court did not make the required findings, the evidence clearly supports the conclusion the 11 calls "were otherwise intercepted in accordance with the provisions of this chapter." (§ 629.82.) The court correctly determined the initial wiretap authorization was supported by an adequate finding of necessity and the calls were properly minimized. The 11 calls related to criminal street gang activity and conspiracy to commit murder, which are enumerated crimes under section 629.52, subdivision (a). The task force legally intercepted both targeted and statutorily authorized communications. While the reports covering the period from December 13 to December 24, 2004, were not timely, the supervising judge was informed of the "credible heads call" when the task force applied for an extension of the initial wiretap order on December 22. Because the material was legally

---

[16] We are not persuaded by the state's argument that a seven-month delay conforms to the "as soon as practicable" requirement under *U.S. v. Vario* (2d Cir. 1991) 943 F.2d 236, 243. In that case the government did not become aware of the relevance of the material for four years. (*Ibid.*) Here, the evidence shows the task force and district attorney's office knew the contents of the wiretaps within days of the nontargeted, intercepted communications. We also note that the processes for retrieving the taped communications in *Vario* were far more cumbersome in 1983 than they were here in 2005. (*Ibid.*)

intercepted, we determine the errors did not contravene the Fourth Amendment and, with respect to the statutory violations, the purposes of the provision were achieved despite the errors. (*Jackson, supra,* 129 Cal.App.4th at p. 149.)

We further conclude the errors were harmless and do not require reversal. (*People v. Watson* (1956) 46 Cal.2d 818, 836–837 [299 P.2d 243].) The material was intercepted in accordance with the Act. Defendants were not surprised by the proposed use of the 11 calls at trial; they had copies of the material before the 2005 suppression hearings. The application to use the material was made in advance of trial. They had the opportunity at trial to object to the material. Defendants' rights to a fair trial were not violated.

## II

### VEHICLE STOP

Defendants contend the reason for the vehicle stop was pretextual because the police did not have reasonable suspicion the vehicle's tinted windows violated the applicable Vehicle Code. They assert the resulting search violated constitutional prohibitions against unreasonable search and seizure and the court erred when it did not suppress all evidence obtained from the vehicle stop.

"A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in the light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231 [36 Cal.Rptr.2d 569, 885 P.2d 982]; see also *In re James D.* (1987) 43 Cal.3d 903, 914 [239 Cal.Rptr. 663, 741 P.2d 161] (*James D.*).) In other words, any reasonable police officer in a like position, drawing on his or her training and experience, would suspect the same criminal activity and involvement by the person in question. (*James D.*, at pp. 914–915, citing *In re Tony C.* (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957].) The officer's subjective intent or ulterior motive for the vehicle stop is not determinative of its legality. (*Whren v. United States* (1996) 517 U.S. 806, 812–813 [135 L.Ed.2d 89, 116 S.Ct. 1769] (*Whren*).)

The standard of review for the denial of a motion to suppress is well settled. "We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]" (*People v. Glaser* (1995) 11 Cal.4th 354, 362 [45 Cal.Rptr.2d 425, 902 P.2d 729].)

On January 16, 2005, task force officers, including the officer who stopped the vehicle, knew from recent and contemporaneous intercepted conversations that Roberts and Brown were about to carry out a planned action against the Bloods. Task force officers had reason to believe the men were armed. Officer Norton and his partner, Officer McKean (together, officers), were briefed about a possible shooting in Deep Valley. They were informed Roberts and Brown could possibly be involved in or conduct a shooting that night. Detective Anderson instructed task force officers to find any reason to stop Roberts and Brown's vehicle.

Officer Norton stated, "We received direction that the vehicle was to be stopped. What it was to be stopped for, I don't recall receiving any info what to stop it for, just to find a reason to stop it." Because of the briefing earlier that night, Norton believed there was a gun in the car.

The officers followed the car after it passed their location. McKean testified they did not develop probable cause to stop the vehicle until they pulled alongside it. Norton noticed he could not see through the driver's tinted side window from the open passenger side window. He believed the view from the windows was obstructed by the tint in violation of Vehicle Code section 26708.5, subdivision (a). The officers stopped the vehicle. Norton smelled alcohol and saw an open container in the car. Brown confirmed there was alcohol in it. The officer asked Roberts and Brown to step out of the car. Norton then searched the car and found a handgun under the front passenger seat.

Roberts moved to suppress evidence obtained from the automobile stop. He argued the reason for the vehicle stop was pretextual and the evidence should be excluded as the fruit of an illegal search. The motion was denied.

Generally, a stop is considered "pretextual" when a law enforcement officer observes or suspects a minor traffic infraction, and uses it to stop the vehicle and search it for evidence even though the officer has no legal basis to suspect the vehicle contains any illegal contraband or the occupants are engaged in any criminal activity. (See, e.g., *Whren, supra*, 517 U.S. at p. 808, *People v. Uribe* (1993) 12 Cal.App.4th 1432, 1435–1436 [16 Cal.Rptr.2d 127]; accord, *People v. Miranda* (1993) 17 Cal.App.4th 917, 923 [21 Cal.Rptr.2d 785].) This was not the situation here.

Although the reason given to Roberts and Brown for the vehicle stop was artful, the stop was more than an investigative stop or detention predicated on mere curiosity, rumor, or hunch. (See *James D., supra*, 43 Cal.3d 903, 914–915, citing *Terry v. Ohio* (1968) 392 U.S. 1, 22 [20 L.Ed.2d 889, 88 S.Ct. 1868].) The stop itself was not pretextual. "It is well settled in California

officers can make arrests based on information and probable cause furnished by other officers." (*People v. Ramirez* (1997) 59 Cal.App.4th 1548, 1553 [70 Cal.Rptr.2d 341] (*Ramirez*).)

Detective Anderson, who was the case agent and wire room monitor, testified the intercepted communications indicated Roberts and Brown were going to Deep Valley to shoot rival gang members. Anderson briefed his team about the intercepted calls. He told the officers that Roberts and Brown were in the vehicle the task force was trying to find. The facts were not imaginary. The police had compelling, articulable facts to support their suspicions that Roberts was armed and ready to carry out a retaliatory murder of one or more members of the Bloods. (*Whren, supra*, 517 U.S. at p. 812.) We conclude the officers' "collective knowledge" of Roberts's involvement in the planned shooting was valid and reasonable. (*Ramirez, supra*, 59 Cal.App.4th at p. 1555.)

In addition, there is substantial evidence to support the court's finding that Officer Norton's belief the vehicle's tinted windows violated Vehicle Code section 26708.5, subdivision (a), was sufficient to establish probable cause for the stop. Just as "[s]topping defendant's vehicle for a seatbelt violation, even if done as a pretext for the narcotics investigation, was entirely legal," so too was this stop. (*People v. Gomez* (2004) 117 Cal.App.4th 531, 537 [12 Cal.Rptr.3d 398], citing *Arkansas v. Sullivan* (2001) 532 U.S. 769, 771–772 [149 L.Ed.2d 994, 121 S.Ct. 1876], *Whren, supra*, 517 U.S. at pp. 812–813 and *Ramirez, supra*, 59 Cal.App.4th at p. 1557, fn. 1.)

We conclude the vehicle stop did not violate constitutional safeguards against unreasonable search and seizure. "A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza, supra*, 9 Cal.4th 224, 231.) Here the underlying facts for the stop were specific and reliable. The court did not err when it denied the motion to suppress evidence from the vehicle stop.

## III

### *GANG EVIDENCE*

#### A. *Photographs*

Roberts contends the trial court abused its discretion under Evidence Code section 352 when it admitted numerous photos of Roberts, Pettis and others wearing gang colors, showing gang signs, displaying weapons and visiting

grave sites of murdered Crips members and associates. They argue in view of the testimonial evidence establishing their connections with the Crips, the photographs served only to paint Roberts as a dangerous gang member and inflame the jury, and to allow the jury to conclude Pettis was guilty by association.

■ Evidence Code section 352 states in pertinent part the court may exclude evidence if its probative value is substantially outweighed by the probability its admission will create substantial danger of undue prejudice. Evidence creates "undue prejudice" when it " 'uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues.' " (*People v. Robinson* (2005) 37 Cal.4th 592, 632 [36 Cal.Rptr.3d 760, 124 P.3d 363].)

"The weighing process under section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules. [Citations.]" (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314 [97 Cal.Rptr.2d 727].) " 'The [trial] court's exercise of discretion under Evidence Code section 352 will not be disturbed on appeal unless the court clearly abused its discretion, e.g., when the prejudicial effect of the evidence clearly outweighed its probative value.' " (*Jennings, supra*, at pp. 1314–1315, quoting *People v. Brown* (1993) 17 Cal.App.4th 1389, 1396 [22 Cal.Rptr.2d 14].)

The proffered photographs were relevant to prove the crime of conspiracy to commit murder as well as the finding the offense was "for the benefit of, at the direction of, or in association with a criminal street gang," and to rebut defendants' claims. (§§ 182, subd. (a)(1), 186.22, subd. (b).) The defendants denied they were engaged in a conspiracy to carry out a retaliatory murder of one or more Bloods. Pettis denied he was a member of the Crips. Roberts claimed he had friendly personal relationships with Samoans, including members and associates of the Bloods, and therefore would not have sought to kill Blood members.

The trial court was aware of its discretion to exclude evidence under Evidence Code section 352. The court required the prosecution to discuss each of the proffered photographs and explain its relevance. The prosecution explained, photograph by photograph, how the proffered evidence showed a defendant, or both defendants, in the company of other coconspirators, explained a reference made during an intercepted conversation, or demonstrated gang membership or a connection to an earlier gang event. The photographs were not gruesome or shocking. The court excluded photographs it found to be of limited relevance or whose admission would be cumulative. We find nothing in the record to indicate the trial court abused its discretion. (*People v. Jennings, supra*, 81 Cal.App.4th at p. 1314.)

B. *Opinion Evidence*

Roberts argues the gang expert impermissibly exceeded legal limitations by interpreting the meaning of four intercepted telephone calls and opining Roberts had the requisite mental state for conspiracy to commit murder. The testimony at issue concerns Detective Taele's opinion that Roberts asked his child's mother about a vehicle parked in front of a home in order to identify the home where the Bloods' party was to be held, and told her not to attend the party because he intended to return to the home to kill gang members (call 1682). In call 1874, Roberts mentioned "a nigga trying to put some shit together." Taele testified he was referring to a plan. In another conversation, Roberts told Pettis the Bloods were to have a meeting at a park. Taele stated it was important to let Pettis know of the meeting to allow Pettis to coordinate simultaneous attacks on Bloods at the park and the party (call 1878). Defendants also object to Taele's interpretation of a message left for Roberts by a Crips member asking what was going on (call 1894). Taele opined the speaker was referring to the planned attacks. Defendants note the call did not contain any slang language requiring interpretation.

Roberts argues the expert addressed ultimate issues of fact to be decided by the jury and thus violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution. Without citation to the record, Roberts asserts he has not forfeited this claim on appeal because "a general *in limine* was made by defense counsel." He argues to the extent specific objections were required and not made, he received ineffective assistance of counsel.

A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court. (Civ. Code, §§ 3515, 3516; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 396, p. 453; *In re Kevin S.* (1996) 41 Cal.App.4th 882, 885 [48 Cal.Rptr.2d 763].) A party may not assert theories on appeal which were not raised in the trial court. (*Fretland v. County of Humboldt* (1999) 69 Cal.App.4th 1478, 1489 [82 Cal.Rptr.2d 359].) Roberts forfeited the right to assign error on appeal. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 222 [33 Cal.Rptr.3d 337].) Further, even if Roberts did not forfeit this claim, we would find his contention to be without merit.

Evidence Code section 805 states: "Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." The objection that the opinion of an expert coincides with the "ultimate issue" in the case is untenable. (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 651 [126 Cal.Rptr.2d 876] (*Killebrew*).) This rule, however, does not permit the expert

to express any opinion he or she may have. (*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 972 [105 Cal.Rptr.2d 88].)

Roberts relies on *Killebrew, supra*, 103 Cal.App.4th 644, for his assertion expert testimony concerning the defendant's subjective knowledge and intent is prohibited. We believe Roberts's construction of its holding is overbroad. *Killebrew* does not generally prohibit such testimony; rather, the reviewing court concluded that in view of the facts and circumstances of that case, the expert's opinion about the defendant's subjective knowledge and intent was inadmissible.

In *Killebrew*, the expert testified at length about gangs and gang psychology. He stated "when one gang member in a car possesses a gun, every other gang member in the car knows of the gun and will constructively possess the gun." (*Killebrew, supra*, 103 Cal.App.4th at p. 652.) The expert's opinion was the only evidence the prosecution offered to establish the elements of the crime. As such, it was "the type of opinion that did nothing more than inform the jury how [the expert] believed the case should be decided." (*Id.* at p. 658; see *Summers v. A. L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1182–1183 [82 Cal.Rptr.2d 162].)

Here, in contrast, Detective Taele testified about the planned action based on defendants' prior telephone conversations. The challenged testimony includes Taele's interpretation of gang slang, his opinion Roberts confirmed that a vehicle belonged to a member of the Bloods in order to identify the correct home, locating the whereabouts of a Crips member to get everyone together, and allowing Pettis to coordinate the plan to attack Bloods meeting at the park and party. We are not persuaded the testimony of the gang expert exceeded permissible legal limits.

We observe that counsel's failure to object does not establish ineffective assistance of counsel. Roberts cannot show that had defense counsel objected to the admission of the gang expert's testimony concerning the four intercepted conversations at issue, the court would have excluded the testimony. (Evid. Code, § 353, subd. (b).) Further, even if those conversations had been excluded, Roberts cannot show there was a reasonable probability the verdict would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 686 [80 L.Ed.2d 674, 104 S.Ct. 2052].)

IV

*SEVERANCE*

Roberts contends the court abused its discretion when it did not sever the trial after Pettis decided to testify. He submits the trial judge has a continuing

duty at all stages of the trial to grant a motion for separate trials if a joint trial results in prejudice to a codefendant. (*Schaffer v. United States* (1960) 362 U.S. 511, 516 [4 L.Ed.2d 921, 80 S.Ct. 945].) Roberts argues the admission of previously excluded calls violated his federal due process rights. He asserts the limiting instructions to the jury could not overcome the prejudicial effect of the intercepted calls in which Pettis described Roberts's involvement in the conspiracy to others.

On July 24, 2006, Roberts filed a motion for a separate trial. He asserted the admission of Pettis's extrajudicial statements that were made before Roberts allegedly became involved in the conspiracy and after the conspiracy was terminated would violate the principles set forth in *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265] (*Aranda*) and *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620] (*Bruton*) (together, *Aranda-Bruton*).[17]

The trial court stated the conspiracy began on December 13, 2004, with the "credible heads call" and ended on January 16, 2005, when Roberts and others were arrested. The court ruled the calls intercepted before December 13 and after January 16 (with the exception of conversations between Pettis and Roberts) were inadmissible because they were made before the conspiracy started or after it ended. (See *Callan v. Superior Court* (1962) 204 Cal.App.2d 652, 664 [22 Cal.Rptr. 508] [statements made by one defendant outside the presence of his codefendant, not in furtherance of the alleged conspiracy and after consummation or frustration of the conspiracy are hearsay as to the latter].) To avoid implicating *Aranda-Bruton*, the prosecution decided not to offer several other intercepted telephone conversations. The excluded and withdrawn calls included sessions Nos. 187, 12066, 12072, 12091, and 12492 (previously excluded calls or calls). The court ruled that because the intercepted communications implicating Roberts's confrontation rights were not to be admitted into evidence, a joint trial did not create an

---

[17] The California Supreme Court held in *Aranda, supra*, 63 Cal.2d at pages 529 to 530, that the practice of permitting joint trials when the confession of one defendant implicates codefendants engenders grave constitutional doubts, and the practice is prejudicial and unfair to the nontestifying defendant.

A few years later in *Bruton, supra*, 391 U.S. at page 126, the United States Supreme Court held that " 'because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining [the codefendant's] guilt,' " admission of a confession by the other, nontestifying defendant in a joint trial " 'violated [the codefendant's] right of cross-examination secured by the Confrontation Clause of the Sixth Amendment.' " (*People v. Fuentes* (1998) 61 Cal.App.4th 956, 962 [72 Cal.Rptr.2d 237].)

"*Bruton* and its progeny provide that if the prosecutor in a joint trial seeks to admit a nontestifying codefendant's extrajudicial statement, either the statement must be redacted to avoid implicating the defendant or the court must sever the trials." (*People v. Hoyos* (2007) 41 Cal.4th 872, 895 [63 Cal.Rptr.3d 1, 162 P.3d 528]; see *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 43 [17 Cal.Rptr.3d 710, 96 P.3d 30] (*Coffman*).)

*Aranda-Bruton* problem. The court barred the prosecution from admitting the calls in its case-in-chief and denied the motion for severance.

When Pettis decided to testify at trial, Roberts objected to the admission of the previously excluded calls. Roberts did not file a motion to sever the trial. The court ruled the previously excluded calls could now be used to impeach Pettis's testimony. The court ruled Roberts now had the opportunity to confront Pettis and the admission of the calls did not invoke *Aranda-Bruton.* The parties agreed the court would instruct the jury the previously excluded calls could not be used as evidence against Roberts.

 In accordance with legislative preferences, the California Supreme Court has expressed a strong preference for the economy and efficiency of joint trials. (*People v. Soper* (2009) 45 Cal.4th 759, 771–772 [89 Cal.Rptr.3d 188, 200 P.3d 816]; *Coffman, supra,* 34 Cal.4th at p. 40.) Section 1098 provides in pertinent part: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials." Roberts and Pettis were charged with having committed a common crime involving common events, presenting the court with "a ' "classic case" ' for a joint trial." (*Coffman, supra,* at p. 40, quoting *People v. Keenan* (1988) 46 Cal.3d 478, 499–500 [250 Cal.Rptr. 550, 758 P.2d 1081].)

If certain circumstances apply, the court may order separate trials. For example, the court may sever the trials if there is an incriminating confession by one defendant that implicates a codefendant, the defendants will present conflicting defenses or when " 'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.' " (*People v. Lewis* (2008) 43 Cal.4th 415, 452 [75 Cal.Rptr.3d 588, 181 P.3d 947] (*Lewis*).)

We review the denial of a motion for severance for abuse of discretion based upon the facts as they appeared when the trial court ruled on the motion. Even if a trial court did not abuse its discretion when it denied a motion for severance, we must determine whether the joinder of defendants for trial resulted in "gross unfairness depriving the defendant of due process of law." (*People v. Rogers* (2006) 39 Cal.4th 826, 851 [48 Cal.Rptr.3d 1, 141 P.3d 135] (*Rogers*).) In the case of a violation of federal due process, reversal is required unless the state can prove beyond a reasonable doubt the error did not contribute to the verdict. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229 [57 Cal.Rptr.3d 92].)

Roberts contends the denial of his due process rights occurred when Pettis decided to testify at trial. He thus implicitly acknowledges the court did not

abuse its discretion at the time it denied his motion for separate trials. Therefore we examine whether the admission of the previously excluded calls resulted in a violation of Roberts's due process rights to a fair trial. (*Rogers, supra*, 39 Cal.4th at p. 851.)

We cannot conclude that Roberts was deprived of his due process rights to a fair trial. Roberts had the opportunity to cross-examine Pettis, the hearsay declarant; thus the admission of the previously excluded calls did not violate *Aranda-Bruton*. Although Roberts objected to the admission of the previously excluded calls as inadmissible hearsay, when the court stated the calls were admissible for impeachment purposes, Roberts agreed to the limiting instructions to the jury. When each of the previously excluded calls was admitted into evidence, the trial court directed the jury not to consider the statements Pettis made in those calls to others in assessing Roberts's guilt. We presume the jury followed the court's instructions. (*Greer v. Miller* (1987) 483 U.S. 756, 766, fn. 8 [97 L.Ed.2d 618, 107 S.Ct. 3102].)

Even were we to find error, we would conclude the joint trial did not prevent the jury from making a reliable judgment about Roberts's guilt or innocence. (*Lewis, supra*, 43 Cal.4th at p. 452.) In addition to the evidence in the previously excluded calls, there was strong and ample independent evidence against Roberts. The jury heard other calls in which Roberts sought weapons, helped identify locations of rival gang members, and coordinated and participated in imminent action against the Bloods in a residential neighborhood. The jury could conclude from wiretap, photographic and testimonial evidence that Roberts was a member of the Crips. The evidence shows that officers stopped Roberts as he was preparing to carry out the planned murder or murders. When he spoke to Pettis from the jail after his arrest, Roberts asserted he had been about to act at the time he was arrested.

Roberts does not demonstrate error. The admission into evidence of the previously excluded calls did not deprive Roberts of a fair trial, nor did it prevent the jury from making a reliable judgment about Roberts's guilt or innocence. (*Rogers, supra*, 39 Cal.4th at p. 851; *Lewis, supra*, 43 Cal.4th at p. 452.)

V, VI[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[*]See footnote, *ante*, page 1149.

## DISPOSITION

The judgment is affirmed.

McConnell, P. J., and Irion, J., concurred.

A petition for a rehearing was denied June 17, 2010, and appellants' petition for review by the Supreme Court was denied September 15, 2010, S183976.