Filed 3/18/13  P. v. Montgomery CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>            v.<br><br>SHAWN JULIAN MONTGOMERY,<br><br>      Defendant and Appellant. | F062095<br><br>(Super. Ct. No. F10901528)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  John F. Vogt, Judge.

Hilda Scheib, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Jeffrey A. White, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted defendant Shawn Julian Montgomery of attempted murder (Pen. Code, §§ 664, 187, subd. (a));**1** shooting from a motor vehicle (§12034, subd. (c)); shooting at an occupied motor vehicle (§ 246); possession of a firearm by a felon (former § 12021, subd. (a)(1)); and active gang participation (§ 186.22, subd. (a)); and found true various enhancement allegations.

Montgomery contends that he was denied a fair trial because a gang expert gave his opinion about the facts of the case, instead of limiting his testimony to responses to hypothetical questions that tracked the evidence that was presented. Montgomery also contends the trial court erred by admitting certain photographs and a "gang roll call" into evidence without proper authentication. Recognizing that defense counsel neither raised the issue of authentication of evidence nor objected to the gang expert's testimony, he further argues that, to the extent these issues have been forfeited on appeal, he received ineffective assistance of counsel. Finally, he contends that the trial court erred by failing to instruct the jury on a lesser-included offense.

We affirm the judgment.

### *FACTUAL AND PROCEDURAL HISTORIES*

On the evening of December 24, 2009, Rosalinda Villarreal and Jaime Ponce, along with their children, were driving home after visiting Villarreal's mother. They were in a gray Chevy Tahoe, a sport utility vehicle (SUV). Villarreal was driving, Ponce sat in the front passenger's seat, and the children sat in the back. Around 11:30 p.m., they stopped at a Fastrip in Sanger to get gas. The Fastrip had a store and gas pumps on either side of the store. As Villarreal pulled into the Fastrip lot, a man stood in her way. She waited for him to move and then drove up to the gas pumps. Ponce got out and pumped gas, while Villarreal remained in the SUV with the children. After he finished pumping

---

**1**Subsequent statutory references are to the Penal Code unless noted otherwise.

2.

gas, Ponce got back in the SUV, and Villarreal asked if he had gotten the receipt. He had not, so Ponce got out of the SUV to retrieve the receipt from the gas pump.

Ponce got the receipt from the gas pump and, as he walked around the SUV to get back to the front passenger door, he heard five or six gunshots. According to Villarreal, she saw a pearl white Mitsubishi Galant in front of her, about 14 feet from her SUV. From the back passenger-side window of the Galant, a man "stuck his whole body out," and shot at the SUV. The shooter had tattoos on both sides of his face and was the same man Villarreal had seen before she pulled up to the gas pumps.

Ponce saw that the passenger window of the SUV had shattered. He felt his stomach getting warm and it became hard to breath, and Ponce realized he had been shot. When the shots shattered the window of the SUV, Villarreal turned around to check on her children and saw that they were okay. She could not see Ponce, so she opened her door and called for him. Ponce responded that he had been shot, and Villarreal got out of the car. She pulled up Ponce's shirt because he was holding his stomach with his hand, and she saw blood start running down his legs. Ponce was taken to the hospital, where he stayed from December 25 to December 31, 2009. He had two surgeries as a result of his injuries. At trial, the parties stipulated that Ponce suffered great bodily injury as a result of being shot.

Villarreal described the shooter to the police as a Hispanic male with short hair, skinny, and with tattoos on both sides of his face. The day after the shooting, Villarreal picked Montgomery's photograph out of a photographic lineup of six photos, and she identified him as the shooter at trial. Ponce, however, did not see who had shot him that night.

The Fresno County District Attorney charged Montgomery with five counts: (1) attempted murder of Ponce (§§ 664, 187, subd. (a)); (2) shooting from a motor vehicle (§ 12034, subd. (c)); (3) shooting at an occupied motor vehicle (§ 246); (4) possession of a firearm by a felon (former § 12021, subd. (a)(1)); and (5) active gang participation

(§ 186.22, subd. (a)). With respect to the first through third counts, it was alleged that the offense was committed for the benefit of the Chankla Bulldog criminal street gang (§ 186, subd. (b)(1)), and that Montgomery had personally and intentionally discharged a firearm causing great bodily injury to Ponce (§ 12022.53, subd. (d)).

A jury trial began on January 18, 2011. Villarreal and Ponce testified about the shooting. Ponce also testified that he had been associated with a gang, the Sanger South Side Sureños, from the time he was 13 years old until he was about 30, but he stopped associating with the gang in 2006. He was not wearing anything to indicate he was a Sureño gang member and he had no visible gang tattoos. Ponce did not know Montgomery, but agreed that in a small town like Sanger it would be common for gang members to recognize their rivals. Ponce explained that Montgomery was younger than he was, and he did not know him because they were not in the same age group.

The prosecution presented two witnesses who placed Montgomery at the Fastrip on the night of the shooting. Kelley Shepherd testified that on the night of December 24, 2009, she asked her mother's roommate, Marcela Gonzalez, for a ride to the store. Gonzalez took Shepherd to the Fastrip in her white Mitsubishi Galant. Montgomery, who was Gonzalez's boyfriend, went with them. Montgomery was introduced to Shepherd as "Sparky," and she did not know his real name. Before that night, Shepherd had seen Montgomery in passing but had not met him. Shepherd sat in the front passenger seat, Gonzalez drove, and Montgomery sat in the back seat on the right side. Shepherd, who had been drinking that day, and Gonzalez went inside the store to buy alcohol. As they went to the register to pay, they saw a television showing surveillance video of the parking lot and saw that Montgomery was not in Gonzalez's car and was walking around in the parking lot. Gonzalez went to the entrance of the store and told Montgomery to get back in the car. Shepherd saw a pickup truck pull up and Montgomery talked to someone in the truck.

Shepherd testified that she and Gonzalez completed their purchase and then went outside. Montgomery would not get in the car. He kept saying something about a scrap, "fuckin' scrap," and "he was just walking in circles, like he didn't know what to do, like he was confused …." Shepherd and Gonzalez got in the car and were ready to leave Montgomery at the Fastrip. Finally, Montgomery got in the car as they were about to leave. He sat in the back seat directly behind Shepherd and did not say anything. Shepherd testified that they were stopped to pull out of the Fastrip when she heard loud gunshots. She heard Gonzalez say, "'What the fuck, Shawn,'" and Shepherd "knew it was him …." Shepherd turned around and saw Montgomery with his arm out the window with a gun. He was pointing the gun at a gas pump where a blue SUV was parked. She thought she heard about four to six shots. After the shooting, Montgomery said he wanted to be dropped off in the Chankla, a neighborhood in Sanger.

Gonzalez also testified. In December 2009, she was renting a place at Shepherd's mother's house and dating Montgomery. Gonzalez confirmed Shepherd's testimony that she drove Shepherd and Montgomery to the Fastrip on the night of December 24, 2009, to buy alcohol. She drove an off-white Mitsubishi Galant. Gonzalez testified, however, that when she and Shepherd went into the store, Montgomery stayed in the car. When she left the store and got to her car, Montgomery was still inside, sitting in the back seat. When she was pulling out of the gas station, Gonzalez "heard gunshots from far away." She did not know what was going on and she did not look around to see where the shots were coming from. Gonzalez testified that she did not see Montgomery with a gun. She testified that she did not remember Montgomery yelling, "'What's up, Bulldog'" when the shots were fired. As will be seen, however, in a police interview the day after the shooting, she told the police that Montgomery yelled, "'What's up, Bulldog?'"

Gonzalez drove home and asked Montgomery what was going on. She then switched cars and dropped Montgomery off at his home.

5.

Sanger Police Officer Brandon Coles testified that he was on duty on December 24, 2009, and responded to a report of a shooting at the Fastrip. He reviewed video surveillance from the store's video cameras with another officer, Tom Reinhart. Reinhart recognized Shepherd from previous investigations, which he described as "[t]ruancy type, runaways, other investigations in the home." An address was located for Shepherd, and Coles and other police officers went to that address, which was Shepherd's mother's house. Gonzalez and Shepherd were both at the house, and they agreed to go to the police station to be interviewed. Coles observed a white Galant in the driveway that matched the car he had seen in the Fastrip surveillance video. In the back seat of the Galant, Coles found a notebook with photographs of Montgomery. On the first page of the notebook was written, "Marcie heart Shawn Montgomery."

On December 25, 2009, Coles interviewed Shepherd and Gonzalez at the police station, and their taped interviews were played for the jury. In her interview, Gonzalez acknowledged that Montgomery did not remain in the car while she and Shepherd were in the Fastrip store, and she told him to get back in the car. She told Coles, "And then when I looked over he was outside the car and I just told him, 'Get inside the car, like, you don't need trouble. Just get inside the car.'" Gonzalez saw that an Avalanche truck pulled up and Montgomery talked to somebody. When she returned to her car from the store, she asked Montgomery who it was and he said it was Johnnie. After Gonzalez told him to get in the car, Montgomery "flipped [her] off," and she had "a feeling it's gonna go bad." As Gonzalez drove out of the Fastrip lot, Montgomery yelled out, "'What's up, Bulldog?'" and then shots started firing. Gonzalez turned around and Montgomery's "whole front side" was outside the window of the car. She drove home and then used her roommate's car to drop Montgomery off.

In Shepherd's interview, she described seeing Montgomery talking to someone in a truck. "Shawn was talking with this truck, there was um, a truck and that guy in the truck was saying, 'Yeah, it's a scrap but, but be cool dog.'"

6.

Andrew Simonson of the Fresno County Sheriff's Department testified as "an expert on the area of the Chankla criminal street gang." Simonson worked for the Multi-Agency Gang Enforcement Consortium, assigned to the City of Sanger and the Bulldog criminal street gang. Simonson explained that Sanger has three gangs: the Olivo Street Bulldogs, the Chankla Bulldogs, and the Sanger Sureños. The Chankla Bulldogs identify with the color red, the Fresno State logo, and the bulldog. They also go by "VCKL" and "Varrio Chankla," and common tattoos associated with the gang are "VCKL," dog paws, dog collars, and "CKL." The Chankla Bulldogs are part of the overall Bulldog gang, which is a criminal street gang specific to Fresno County. They get along with most subsets of the Bulldogs, except the Olivo Street Bulldogs, who are their rivals. The Sanger Sureños are rivals of all Bulldogs, including the Chankla Bulldogs. Simonson testified that the Chankla Bulldogs had approximately 110 members.

Simonson discussed several predicate offenses committed by Chankla Bulldog gang members. In one of the offenses, Johnny Valencia, a Chankla Bulldog gang member, stabbed a victim whom he believed was a rival Sanger Sureño. Right before the attack, Valencia said, "'What up, dog?'" In another case, two Chankla Bulldog gang members, Nestor Retamoza and Frank Subia, chased down a victim and stabbed him several times. Simonson testified that the primary activities of the Chankla Bulldogs are possession of dangerous weapons, drive-by shootings, and assaults.

Simonson reviewed police reports and other documents related to Montgomery and put together a gang report. He explained that the sheriff's department uses a 10-point criteria system to determine whether someone is a gang member. These points include having gang tattoos, admitting gang membership to police, and being contacted by police while in the company of known gang members. In addition, jail classification—when a person admits to jail custody staff that he is a gang member—is a stand-alone criterion for determining gang membership. Simonson found that Montgomery met all 10 points and the separate criterion of jail classification. There were 13 documented instances of

7.

Montgomery being booked into Fresno County jail and admitting that he was a Chankla Bulldog, spanning from 2001 to 2009. Simonson also had documentation of Montgomery associating with Subia and Valencia.

Simonson's gang report included several photographs. He testified that some photos were seized from Subia in a search related to the investigation of the stabbing by Retamoza and Subia and others were found on a Myspace website. Other photos appear to have been taken during police contacts. Some of the photographs showed Montgomery's tattoos on his front torso, face, back of the head, neck, and back. Montgomery had a "C" on the right side of his face, "Chankla" on his forehead, "VCKL," below his right eye, "BD" (for Bulldog) on his chin, "FC" with a bulldog on his left cheek, a large bulldog on the center of his chest with "VCKL" underneath, and a handgun on his right side, among other tattoos. Other photos showed Montgomery with known gang members. For example, in one photograph, he is seen wearing a red bandanna and another gang member "is throwing a hand sign 'C' for Chankla."

The gang report also included a "roll call" listing members of the Chankla Bulldogs by their monikers. Simonson explained that roll calls are sometimes painted on alleys, but this roll call was taken in a search of Subia's house. "Sparky," which is Montgomery's moniker, appeared on the roll call. The photographs and roll call were part of the basis for Simonson's opinion in this case.

Simonson gave his opinion that Montgomery was an active participant in the Chankla Bulldogs, explaining, "He currently continues to associate with other Chankla Bulldogs and he continues to represent his allegiance through more and more gang-related tattoos." Asked about where Montgomery ranked among respected, feared, and notorious gang members, Simonson responded, "I'd say he's the most influential member of the Chankla Bulldogs that is not in the Department of Corrections custody."

The prosecutor then asked Simonson if there were "any facts about the present case that stood out to [him]." Simonson testified that identifying a rival gang member by

the term "scrap" and identifying his gang by saying "Bulldog" before the attack stood out to him. Simonson explained that "scrap" was a derogatory term used to refer to the Sureños. Saying "What's up, Bulldog?" was significant because "[i]t's claiming ownership that he is, in fact, a Bulldog."

Simonson agreed that a gang member can earn respect within his gang and from rivals by committing a violent act and that a gang member who shoots a rival or perceived rival would gain respect for himself and bolster the reputation of his gang. Finally, Simonson opined that Montgomery's actions in this case benefited the Chankla Bulldogs as it "bolstered his status as someone that is willing to—to do a violent crime for his gang."

The defense presented alibi evidence for Montgomery. Hilda Reyna lived with her mother and other relatives in the area of Sanger known as the Chankla. On December 24, 2009, which was her mother's birthday as well as Christmas Eve, the family had a bonfire in the backyard and friends and family visited. Reyna testified that she had known Montgomery for a few years and he spent that night at her house. He arrived some time between 5:00 and 6:00 p.m. and stayed until the next day. Specifically, around 11:00 p.m. until midnight, Montgomery was at her house; they were in the backyard drinking. Reyna testified that she was not Montgomery's girlfriend and she knew that he had a girlfriend named Marcie.

Reyna also testified that she knew John Munoz. He has a big "C" tattooed on his cheek, and in December of 2009 his hair was short.[2] A photograph of Munoz together with Montgomery was admitted into evidence. Reyna admitted that some of her family members are considered to be associated with the Chankla Bulldogs. Her younger

---

[2]The "C" tattoo was significant because, when police officers interviewed Villarreal soon after the shooting, she described the shooter as having a "C" on one of his cheeks. She also described writing on the forehead and other cheek. One of the officers who spoke to Villareal, Sanger Police Officer Kevin Callahan, testified that he was familiar with two people with "C" face tattoos—Montgomery and Munoz.

brother was an active member of the Chankla Bulldogs and was killed by rival Sureño gang members.

Reyna's mother, Maria Rita Perales, also testified about December 24, 2009. Perales had known Montgomery for about six or seven years and he lived about a half a block down the street from her house. She recalled that Montgomery came to her house around 4:30 or 5:00 p.m. Montgomery arrived with Perales's son, Johnny Reyna, and they went to the backyard. Perales did not hang out in the backyard that night. She stayed in the house with her daughter-in-law and grandchildren and they cleaned the kitchen and watched television. She saw Montgomery in the backyard with her son at around 2:30 a.m. on December 25, 2009. He was still at her house in the morning when she woke up. Perales testified that her son Johnny was later killed, and she was told that he had been killed by a Sureño gang member.

The defense also called Isabel Fimbres. She was at the Fastrip on December 24, 2009, and she saw the drive-by shooting. She had stopped to get gas and was parked next to the person who was shot. She sat in the driver's seat of her car, while her friend got out and paid and pumped gas. She heard some arguing and some girls saying something like, "'Hey, get in the car, get in the car.'" A couple minutes later, Fimbres was texting on her phone when she heard shots. She looked up and saw, to her left, a small car and a person in the passenger seat shooting. Fimbres testified, "I just saw the sleeve and I saw the arm and the guy pulling the trigger several times .…" The shooter was aiming at a big SUV next to her. After the shooting stopped, she saw "like a lot of gunshots on the car" and children crying.

A couple weeks after the shooting, Fimbres went to the police station. She was shown a photographic lineup that included a photograph of Montgomery, but she picked another photograph. The person she identified did not have tattoos all over his face. Fimbres testified that she did not see the shooter's face very well, explaining "It was just mostly … his arm and the gun that I saw." She chose the photo based on the hair and the

10.

fact that he was skinny. She was "not really confident" that she had identified the right person because she did not see the shooter's face clearly. Fimbres agreed that if she had seen tattoos like Montgomery's, she would have remembered them.

The prosecution recalled Simonson to address the photograph Fimbres had picked out of the photographic lineup. He testified that the photograph Fimbres had identified was of a person who had been in custody at a state mental hospital since July 2008 to the present and therefore could not have committed the crime.

In defense counsel's closing statement, he argued that Villarreal was mistaken when she identified Montgomery as the shooter. He stated that, since Fimbres did not see any tattoos on the face of the shooter, Munoz was a more likely suspect because he had a tattoo on his face and short hair as Villarreal described, but it was possible to miss the tattoo as Fimbres had done. In contrast, Montgomery's tattoos covered his face and would be difficult to miss. Defense counsel suggested that Gonzalez and Shepherd could be covering up for the actual shooter. He also pointed out that there was no evidence of the gun and no gunshot residue or DNA evidence linking Montgomery to the shooting.

On January 27, 2011, the jury reached a verdict, finding Montgomery guilty of all five counts and finding all the enhancement allegations true. On March 7, 2011, the trial court sentenced Montgomery to a determinate term of 10 years 8 months and a consecutive indeterminate term of 50 years to life. The sentence was imposed as follows: On count 1, the upper term of nine years, plus 25 years to life to run consecutively for the firearm enhancement, and 10 years stayed for the gang enhancement; on count 2, the middle term of five years to be served concurrently; on count 3, one-third the middle term for one year eight months to be served consecutively, plus 25 years to life to run consecutively for the firearm enhancement and five years for the gang enhancement to be stayed; on count 4, the middle term of two years to be served concurrently; and on count 5, the middle term of two years stayed. Montgomery filed a notice of appeal the next day.

## DISCUSSION

### I.   Gang expert testimony

Montgomery contends that he was denied his rights to a fair trial, due process, and a reliable verdict because the gang expert testified regarding his purported actions, specific intent, and subjective motivations.  Montgomery relies on the Supreme Court's decision in *People v. Vang* (2011) 52 Cal.4th 1038 (*Vang*).  He argues that the gang expert testimony in this case did not comport with *Vang* because Simonson gave his opinion that Montgomery was an active member of the Chankla Bulldogs and acted to benefit the gang by committing violent acts, rather than giving his opinions in response to hypothetical questions.

As we have described, the prosecutor asked Simonson if there were "any facts about the present case that stood out" to him.  Simonson responded by describing the use of the term "scrap" and the phrase "What's up, Bulldog?"  Later, the prosecutor questioned Simonson as follows:

> "[Prosecutor].  In your opinion as a gang expert, as an investigator who's worked in gangs for years, if a gang member were to go out and commit a violent shooting against a rival or someone who he perceived had been a rival even in the past, would that result in respect, gaining respect for that particular gang member?
>
> "[Simonson].  Absolutely.
>
> "Q.  How about for benefitting that gang member's gang, would committing a violent act even for some senseless reason bolster the reputation of that gang?
>
> "A.  Yes.
>
> "Q.  How is that?
>
> "A.  Through reputation.  It goes to reputation.  Individually, their status goes up as well as the totality of the whole gang.  [¶] … [¶]

12.

"Q. In your opinion, did the defendant's actions in this case benefit the Chankla Bulldog criminal street gang?

"A. Yes.

"Q. How—how did that benefit that gang?

"A. Again, individually it bolstered his status as someone that is willing to—to do a violent crime for his gang."

The People point out that Montgomery's trial counsel failed to object to any of the prosecutor's questions or Simonson's responses. As a consequence, he has forfeited the issue on appeal. (*People v. Roberts* (2010) 184 Cal.App.4th 1149, 1193 [claim that gang expert impermissibly opined that defendant had requisite mental state was forfeited on appeal where defense attorney did not object to testimony at trial].) Recognizing that defense counsel did not raise the issue at trial, Montgomery also claims that he received ineffective assistance when his counsel failed to object to Simonson's testimony.

"Establishing a claim of ineffective assistance of counsel requires the defendant to demonstrate (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation prejudiced the defendant, i.e., there is a 'reasonable probability' that, but for counsel's failings, defendant would have obtained a more favorable result." (*People v. Dennis* (1998) 17 Cal.4th 468, 540.) "A court must indulge a strong presumption that counsel's acts were within the wide range of reasonable professional assistance." (*Id*. at p. 541.) "[I]f the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation .…' [Citation.]" (*People v. Cudjo* (1993) 6 Cal.4th 585, 623.)

Courts "have long permitted a qualified expert to testify about criminal street gangs when the testimony is relevant to the case. 'Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is

""""sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (*Id*., subd. (a).) The subject matter of the culture and habits of criminal street gangs, of particular relevance here, meets this criterion.' [Citations.]" (*People v. Gonzalez* (2006) 38 Cal.4th 932, 944 (*Gonzalez*).)

In *Vang*, our Supreme Court held that it is appropriate for an expert to respond to hypothetical questions, and these questions "must be rooted in the evidence of the case being tried …." (*Vang*, *supra*, 52 Cal.4th at p. 1046; see also *Gonzalez*, *supra*, 38 Cal.4th at p. 946; *People v. Gardeley* (1996) 14 Cal.4th 605, 618-619.) The court recognized, however, "'there is a difference between testifying about specific persons and about hypothetical persons.'" (*Vang*, *supra*, at p. 1047, quoting *Gonzalez*, *supra*, at p. 946, fn. 3.) Generally, a witness may not express an opinion on a defendant's guilt. (*Vang, supra*, at p. 1048.) The court explained: "Here, for example, [the gang expert] had no personal knowledge whether any of the defendants assaulted [the victim] and, if so, how or why; he was not at the scene. The jury was as competent as the expert to weigh the evidence and determine what the facts were, including whether the defendants committed the assault. So he could not testify directly whether they committed the assault for gang purposes." (*Ibid*.)

Here, the prosecutor's questions about "any facts about the present case that stood out," and whether "defendant's actions in this case benefit the Chankla Bulldog criminal street gang" were not in the form of hypotheticals. Simonson's responses offered his opinions about Montgomery, not a hypothetical defendant in a hypothetical factual scenario.

Since we are assessing whether Montgomery received ineffective assistance of counsel, the first question is whether defense counsel's failure to object was objectively unreasonable. The People suggest that counsel could have had a tactical reason not to object. If counsel had objected, a sustained objection would have resulted only in a rephrasing of the questions in the form of hypotheticals, but making the objection itself

14.

may have been prejudicial. At the very least, defense counsel may have reasoned there was little to be gained by having the evidence against Montgomery summarized in a long hypothetical question. We need not decide whether defense counsel's performance was deficient in failing to object, however, because we agree with the People that Montgomery has not established prejudice.

The evidence showed that Ponce had been a Sureño gang member for 17 years, and Montgomery had gang tattoos all over his face and body and had identified himself as a Chankla Bulldog to jail staff 13 times. Before the shooting, Shepherd heard Montgomery say "fuckin' scrap" and heard another man say "Yeah, it's a scrap but, but be cool dog." Gonzalez heard Montgomery yell, "What's up, Bulldog?" right before the shots started firing. Shephard saw Montgomery with his arm out of the car window, pointing a gun at a gas pump where an SUV was parked. Villarreal identified Montgomery as the shooter. Given the evidence, it is not reasonably probable that the result would have been more favorable to Montgomery if defense counsel had objected and Simonson had offered his opinions only in response to hypothetical questions.

## II.    *Admission of photographs and gang roll call*

Montgomery next claims the trial court committed prejudicial error by admitting into evidence certain photographs and the gang roll call, all of which were part of the gang report Simonson prepared. He argues that Simonson never provided any foundation for their admission, and they were unauthenticated and irrelevant.

Some of the photographs showed Montgomery's tattoos. Others showed Montgomery with known Chankla Bulldog gang members. The gang roll call listed gang members and included Montgomery's moniker "Sparky." Defense counsel objected to the photographs as cumulative and prejudicial, but he did not raise an objection of lack of foundation or authentication. Defense counsel did not object to the admission of the gang

15.

roll call. As a result, this claim is forfeited on appeal. (Evid. Code, § 353; *People v. Seaton* (2001) 26 Cal.4th 598, 655.)[3]

Again Montgomery attempts to avoid forfeiture by raising a claim of ineffective assistance of counsel. The People submit that defense counsel's decision not to object to the evidence may have been a tactical one. Defense counsel may have determined that it was not beneficial to object on the grounds of lack of foundation or authentication. Had he raised the objection, the prosecutor may simply have called more witnesses— potentially other gang members—to testify regarding the authenticity of the photographs and gang roll call. In addition, we observe that defense counsel offered a photograph into evidence that showed Montgomery with another gang member, Munoz. Perhaps defense counsel chose not to object to the prosecution's photographs because he did not want the authenticity of his own evidence to be questioned. Under these circumstances, we cannot say defense counsel's failure to object to the evidence was deficient.

Further, Montgomery cannot establish prejudice. Even without the photographs, Montgomery's tattoos could be seen on his face. Without the gang roll call, there was still Simonson's testimony that Montgomery had admitted to being a Chankla Bulldog to jail staff 13 times. Reyna testified that her younger brother, Johnny, was an active member of the Chankla Bulldogs and was killed by rival gang members. Perales testified that Montgomery arrived at her house on Christmas Eve 2009 with Johnny. In light of the overwhelming evidence of Montgomery's gang ties, it is not reasonably probable that the outcome would have been different if defense counsel had objected to the photographs and gang roll call.

---

[3]We reject Montgomery's claim, made for the first time in his reply, that admission of the evidence over his Evidence Code section 352 objection was a violation of due process. The admission of the photographs did not make the trial fundamentally unfair. (See *People v. Partida* (2005) 37 Cal.4th 428, 436.)

### III. Jury instructions

In his final claim, Montgomery contends that the trial court had a sua sponte duty to instruct the jury on grossly negligent discharge of a firearm (§ 246.3) as a lesser-included offense of shooting at an occupied vehicle (§ 246, count 3). He argues that the court's alleged instructional error was prejudicial and therefore his conviction for count 3 must be reversed. We disagree.

In count 3, Montgomery was charged with violation of section 246, which provides in part: "Any person who shall maliciously and willfully discharge a firearm at an … occupied motor vehicle … is guilty of a felony .…" "[S]ection 246 is not limited to shooting *directly* at an inhabited or occupied target. Rather, it proscribes shooting *either* directly at *or* in close proximity to an inhabited or occupied target under circumstances showing a conscious disregard for the probability that one or more bullets will strike the target or persons in or around it." (*People v. Overman* (2005) 126 Cal.App.4th 1344, 1355-1356.)

Section 246.3, subdivision (a), is a necessarily included lesser offense[4] of section 246. (*People v. Ramirez* (2009) 45 Cal.4th 980, 990.) This statute provides in part that "any person who willfully discharges a firearm in a grossly negligent manner which could result in injury or death to a person is guilty of a public offense and shall be punished by imprisonment in a county jail not exceeding one year .…"

A trial court is required, sua sponte, to instruct the jury on all necessarily included lesser offenses that find substantial support in the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 148-149, 162 (*Breverman*).) This rule obligates the court to instruct the jury "on lesser included offenses when the evidence raises a question as to whether all of

---

[4]"Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117-118.)

the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged." (*Id.* at p. 154.) A trial court is not required to instruct on theories that are not supported by substantial evidence. (*Id*. at p. 162.)

Montgomery argues there was substantial evidence to support an instruction on section 246.3 as follows: Shepherd told Coles that Montgomery was firing at a man standing near a gas pump, and Gonzalez had no idea where Montgomery was firing. Surveillance videotape showed a white car and its position in the gas station but did not show the direction in which the shooter was firing. Montgomery continues: "In fact, the shooter was only a faint presence, more an undefined shape protruding from the car, than a figure with a recognizable weapon in his hand.… Since the weapon was never recovered, there was no evidence that the bullet which struck the SUV was fired from the gun in [Montgomery's] possession. A jury may have believed that there were two cars involved, one belonging to Johnnie … who fired at least one of the shots. In addition, without the gun, its condition and the possibility it misfired were never considered. This constitutes substantial evidence from which a jury might have concluded that [Montgomery] was guilty of violating section 246.3, rather than section 246, and that his striking the vehicle was intentional and grossly negligent, but not malicious."

We disagree. It is not the rule that "'*any* evidence, no matter how weak'" justifies instructions on a lesser-included offense. (*Breverman*, *supra*, 19 Cal.4th a p. 162.) In this case, there was no evidence that Montgomery discharged a firearm in a grossly negligent manner, but did not maliciously and willfully shoot at or in close proximity to Ponce and Villarreal's SUV—which was occupied at the time by Villarreal and her four children. Villarreal testified that Montgomery shot at the SUV. Shephard testified that Montgomery was pointing the gun at a gas pump where a blue SUV was parked. Fimbres testified that the shooter was aiming at the big SUV that was parked next to her. Gonzalez testified that, when she heard shots, she did not know what was going on.

There was nothing in Gonzalez's testimony to suggest that Montgomery fired shots, but he did not shoot at or in close proximity to the SUV. There was evidence at trial (Reyna's testimony) that Montgomery was not the shooter, but there was no substantial evidence that the shooter was not aiming at Ponce and his SUV.

Even if the trial court had been required to instruct the jury on grossly negligent discharge of a firearm, the error was harmless. In a noncapital case, failure to instruct sua sponte on lesser-included offenses that are supported by the evidence is reviewed for prejudice under *Watson*.[5] (*Breverman*, *supra*, 19 Cal.4th a p. 178.)

Here, the jury found Montgomery guilty of attempted murder of Ponce and found the firearm-enhancement allegation true. This means the jury found that Montgomery intended to kill Ponce,[6] and he personally and intentionally discharged a firearm causing great bodily injury to Ponce. All the evidence showed that Ponce was in very close proximity to his SUV when he was shot—the Fastrip surveillance videotape matched Ponce's testimony that he was walking from the gas pump (which was within reach of the gas tank of the SUV) to the passenger door of the SUV when he was shot. Given that the jury found that Montgomery intentionally shot at Ponce, and Ponce was in very close proximity to his SUV when he was shot, it is not reasonably probable that the jury would have found Montgomery not guilty of shooting at or in close proximity to an occupied vehicle if it also had been instructed on grossly negligent discharge of a firearm.

---

[5]*People v. Watson* (1956) 46 Cal.2d 818, 836.

[6]The jury was instructed that, to find Montgomery guilty of attempted murder, the People had to prove beyond a reasonable doubt that (1) Montgomery took at least one direct but ineffective step toward killing another person, and (2) Montgomery intended to kill that person. (*People v. Booker* (2011) 51 Cal.4th 141, 177.)

## *DISPOSITION*

The judgment is affirmed.

_____
Wiseman, Acting P.J.

WE CONCUR:


_____
Levy, J.


_____
Poochigian, J.

20.